IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RICHARD LEE HUNTER,
      Petitioner,

v.                              Case No.: 3:17cv483/LAC/EMT

MARK S. INCH,[1]
      Respondent.
_____

## ORDER, REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 19).  Petitioner filed a reply (ECF No. 23).

      The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to federal habeas relief.

---

[1] Mark S. Inch succeeded Julie L. Jones as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d).

I.      BACKGROUND & PROCEDURAL HISTORY

The procedural background of this case is established by the state court record

(ECF No. 19).[2]   On July 16, 2004, Petitioner was arrested and charged with the

premeditated first-degree murder of Mary Holman, committed on or around July 11,

2004 (Ex. A at 1–2).  The facts of the case are briefly summarized as follows:

> On July 16, 2004, Marilyn May contacted the Escambia County Sheriff's
> Office and told them her nephew, Richard Hunter, had confessed to
> killing his friend, Mary Holman.  That afternoon, sheriff's deputies went
> to Hunter's house.  Hunter, who was inside the house smoking crack
> cocaine, refused to come outside.  Twelve hours later, police sent in a
> SWAT team and arrested Hunter for murder.  On August 17, 2004, the
> Escambia County grand jury indicted Hunter for the first-degree murder
> of Mary Holman.  Ms. Holman has never been found.

(Ex. X at 2).

In March of 2006, Petitioner was tried before a jury in the Circuit Court in and

for Escambia County, Florida, Case No. 2004-CF-3230, and found guilty as charged

(Ex. C at 420; Exs. F, G & H).  The court sentenced Petitioner to mandatory life

imprisonment without the possibility of release (Ex. C at 422–30; Ex. H at 406).

Petitioner appealed the judgment to the Florida First District Court of Appeal ("First

DCA"), Case No. 1D06-1637 (*see* Exs. C, I, J & K).  The First DCA reversed

---

[2] Hereinafter all citations to the state court record refer to the electronically filed exhibits to
Respondent's answer (ECF No. 19) unless otherwise indicated.  Additionally, if a page has more
than one page number, the court cites to the "Bates stamp" page number.

Petitioner's conviction and remanded for a new trial (Ex. L).  *Hunter v. State*, 973 So.

2d 1174 (Fla. 1st DCA 2007).  Mandate issued March 3, 2008 (Ex. L).

Petitioner's second trial commenced on October 12, 2009, and concluded the

following day, when the trial court granted Petitioner's motion for a mistrial (Exs. R

& S).  Petitioner's third trial was held in December of 2009.  On December 17, 2009,

the jury returned a verdict of guilty as charged (Ex. Q at 309; Exs. T & U).  The trial

court sentenced Petitioner to mandatory life imprisonment without the possibility of

release (Ex. Q at 311–19; Ex. U at 412–13).  Petitioner appealed the judgment to the

First DCA (Ex. Q at 327; Ex. X).   On May 25, 2011, the First DCA per curiam

affirmed without opinion.  *Hunter v. State*, 61 So. 3d 1117 (Fla. 1st DCA 2011).

Mandate issued June 10, 2011 (Ex. AA).

By mailbox rule on November 14, 2011, Petitioner filed a *pro se* motion for

post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal

Procedure, in which he raised approximately eighty-three grounds for relief under

thirty-three headings, and a supplement thereto (Ex. LL1).  The circuit court struck

this motion as facially insufficient, with leave to amend (Ex. LL2 at 33–36).  By

mailbox rule on February 2, 2012, Petitioner filed an amended Rule 3.850 motion and

a supplement thereto, raising eighty-four claims (Ex. LL2 at 37–84, 85–88).  The

circuit court struck the amended motion and supplement finding it "abusive of the

postconviction system" with leave to amend, stating that Petitioner "should confine

his allegations to a reasonable number of claims" (Ex. LL2 at 91–93).  Thereafter,

Petitioner filed a supplement to his amended Rule 3.850 motion adding another claim

for relief, which the circuit court dismissed as moot citing its previous order striking

Petitioner's amended motion (Ex. LL2 at 94–96, 97–98).  By mailbox rule on April

11, 2013, Petitioner filed a *pro se* second amended Rule 3.850 motion raising

approximately nineteen grounds for relief (Ex. LL2 at 99–144).  By mailbox rule on

April 24, 2013, Petitioner filed a supplement to his *pro se* second amended Rule 3.850

motion (Ex. MM at 147–200).  On April 29, 2013, William Richbourg, Esq., notified

the court that he had been retained to represent Petitioner and sought leave to amend

Petitioner's second amended Rule 3.850 motion (Ex. LL2 at 145–46).  The circuit

court dismissed Petitioner's second amended Rule 3.850 motion for lack of a proper

oath, with leave to file a properly sworn motion or for Mr. Richbourg to request an

extension of time to file an amended motion (Ex. MM at 241–42).  By mailbox rule

on May 15, 2013, Petitioner filed a *pro se* third amended Rule 3.850 motion and a

supplement thereto (Ex. MM at 243–93).  Also through counsel, Petitioner filed two

motions for extension of time to file an amended Rule 3.850 motion, which the court

subsequently granted, after dismissing Petitioner's *pro se* third amended motion due to his being represented by counsel (Ex. MM at 294–95, 296–97, 298–302).

On August 9, 2013, Petitioner filed his counseled, amended Rule 3.850 motion raising eight grounds for relief (Ex. MM at 303–26). The circuit court summarily dismissed Ground Seven of the motion and ordered that an evidentiary hearing be conducted on the remaining grounds (Ex. MM at 333–35). An evidentiary hearing was held on March 12, 2015 (Ex. NN at 338–461). After the evidentiary hearing, post-conviction counsel filed a memorandum in support (Ex. NN at 475–97). On June 15, 2015, the circuit court denied Petitioner's amended motion (Ex. OO at 560–74). Petitioner appealed the denial of post-conviction relief *pro se* to the First DCA (Ex. PP). After briefing by the parties, the First DCA per curiam affirmed without opinion, also denying Petitioner's motion for a rehearing (Exs. SS & TT). Mandate issued June 5, 2017 (Ex. SS).

In addition, by mailbox rule on December 19, 2012, Petitioner filed a *pro se* petition for a writ of habeas corpus in the First DCA alleging ineffective assistance of appellate counsel on direct appeal (Ex. UU). On January 11, 2013, the First DCA per curiam denied the petition on the merits without explanation (Ex. VV). The appellate court also denied Petitioner's motion for a rehearing without discussion (Ex. WW).

Petitioner filed his timely *pro se* petition for a writ of habeas corpus in this

court by mailbox rule on July 18**,** 2017. The petition is now ripe for adjudication.

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254. Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254(d) provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the
> > State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> court on a question of law or if the state court decides a case differently

than this Court has on a set of materially indistinguishable facts.  Under
the "unreasonable application" clause, a federal habeas court may grant
the writ if the state court identifies the correct governing legal principle
from this Court's decisions but unreasonably applies that principle to the
facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue presented in a federal habeas

petition upon which there has been an adjudication on the merits in a state court

proceeding, the federal court must first ascertain the "clearly established Federal law,"

namely, "the governing legal principle or principles set forth by the Supreme Court

at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63,

71–72 (2003).  The law is "clearly established" only when a Supreme Court holding

at the time of the state court decision embodies the legal principle at issue.  *See Thaler*

*v. Haynes*, 559 U.S. 43, 47 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372,

1376 (2015) ("We have explained that clearly established Federal law for purposes of

§ 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's

decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines

whether the state court adjudication is contrary to the clearly established Supreme

Court case law.  The adjudication is not contrary to Supreme Court precedent merely

because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court holdings. *Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's holdings. The federal court defers to the

state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam). In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on an unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable

application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See Cave v. Sec'y for Dep't of Corr.*, 638 F.3d 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed

to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

## III.    PETITIONER'S CLAIMS

Ground One:  Sub-claim A:

> "The Trial Court Erred In Denying Ground One Of Petitioner's Postconviction Motion After An Evidentiary Hearing Where The State Conceded That A *Brady* Violation Had Occurred"

In his first ground for relief, Petitioner argues that the State, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), withheld the results of a Florida Department of Law Enforcement ("FDLE") lab report which showed there was no blood or semen

found in or on Petitioner's car (ECF No. 1 at 5, 15–17, 28).[3]  In Respondent's answer, Respondent asserts that Petitioner appears to argue in his habeas petition that the circuit court used the wrong legal standard in evaluating this claim, by using the standard for newly discovered evidence instead of *Brady* (ECF No. 19 at 23–25). Respondent argues that this claim is properly governed by *Brady* and that the state court adjudication of the claim is entitled to deference under the AEDPA.  As noted above, Petitioner labels this claim as a *Brady* violation in his habeas petition, and he clarifies in his reply that he seeks relief under the *Brady* standard (ECF No. 23 at 2).

1.    Clearly Established Federal Law

In *Brady v. Maryland* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment."  373 U.S. at 87.  Under *Brady*, a defendant's due process rights are violated when the prosecution suppresses material evidence favorable to the  defendant, irrespective of the good faith or bad faith of the prosecution.  To establish a *Brady* violation, the defendant must show that: (1) the prosecution possesses evidence, including impeachment evidence; (2) the defendant does not possess the evidence, nor could he obtain it himself with any reasonable

---

[3] This lab report is located in the record at Ex. NN at 466–67.

diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (per curiam); *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). As to the suppression element, the State has an obligation to disclose all exculpatory evidence within its constructive knowledge, including "evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Materiality is determined by asking whether the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The key is a reasonable probability; "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10 (1976).

2.      Federal Review of State Court Decision

Petitioner raised this claim in his counseled, amended Rule 3.850 motion. The

post-conviction court denied relief, and the First DCA per curiam affirmed the denial

(as previously noted, without opinion). The state circuit court adjudicated the claim

as follows:

> Defendant first alleges that he has discovered newly discovered evidence
> which warrants a new trial. Specifically, he cites a report by FDLE
> indicating that no blood was present in Defendant's vehicle after it was
> searched by law enforcement. To warrant relief on this claim, "the
> newly discovered evidence must be of such a nature that it would
> *probably* produce an acquittal on retrial." [FN1] The Court finds that the
> evidence at issue, had it been introduced at trial, would not probably
> have resulted in an acquittal for Defendant. As noted at the evidentiary
> hearing, defense counsel argued at trial that the State had not presented
> any evidence that blood had been present in Defendant's car. Since
> further evidence that there was no blood in Defendant's car would have
> been cumulative, the claim is denied.
>
> [FN1] *Blanco v. State*, 702 So. 2d 1250 (Fla. 1977).

(Ex. OO at 560–61) (emphasis in original).[4] Respondent argues that this claim should

be addressed applying the deferential standard for federal court review of state court

---

[4] The circuit court also held:

> As to the claim that the search warrant was based on the appearance of blood inside
> his car, Defendant is incorrect. The search warrant was based on several factors,
> including alleged admissions by Defendant that he had killed the victim and that she
> "was never coming back." Because the warrant would have been issued even in the
> absence of the appearance of blood in Defendant's car, the claim is denied as no
> prejudice can be shown.

(Ex. OO at 561) (citation to affidavit for search warrant omitted).

Case No.: 3:17cv483/LAC/EMT

adjudications under the AEDPA, relying in part on *Wilson v. Warden, Ga. Diagnostic Prison*, 834 F.3d 1227 (11th Cir. 2016) (en banc) (holding that where a state appellate court has affirmed a trial court without explanation, the relevant question is whether there is any reasonable basis for the state court to deny relief, instead of deferring to the reasoning of the state court).  Since Respondent filed its answer, the Supreme Court reversed this decision.  In *Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188 (2018), the Court held that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment or rejecting the same claim, federal habeas courts employ a "look through" presumption. The *Wilson* Court described this presumption as follows:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale.  It should then presume that the unexplained decision adopted the same reasoning.  But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Id*. at 1192.  Petitioner argues that because the state court applied the incorrect law to his claim, the state court adjudication is not entitled to deference.

In Petitioner's counseled Rule 3.850 motion, Ground One was captioned "Newly Discovered Evidence and/or Ineffective Assistance of Counsel" (Ex. MM at

305). In this motion Petitioner alleged that he first learned of the existence of the lab report in September of 2011 after the completion of his third trial in December of 2009. While *Brady* is not cited in the motion, Petitioner states that "had this lab report been discovered prior to trial, there is more than a 'reasonably probability' that the fact finder would have had a reasonable doubt regarding guilt, and the verdict of the jury would have been different" (Ex. MM at 306). This is the materiality standard articulated in *Brady* (whether "a reasonable probability exists that the outcome of the proceedings would have been different"). In response to Petitioner's Rule 3.850 motion, the State conceded that the lab report in question had not been provided to the defense (Ex. NN at 329). At the subsequent evidentiary hearing on the 3.850 motion, Petitioner's post-conviction counsel identified the claim as a *Brady* violation. He told the court that the issue was twofold, "one is the *Brady* violation itself, and the other one is the significance of the *Brady* violation and how it would have affected the trial" (Ex. NN at 352). In Petitioner's post-evidentiary hearing memorandum in support of his 3.850 motion, he titled this claim a "*Brady* violation" (Ex. NN at 479). Despite the parties treating the claim as one under *Brady*, in denying the claim the circuit court did not cite *Brady*, but articulated the standard under Florida law for newly discovered

evidence claims, citing *Blanco v. State*, 702 So. 2d 1250 (1977).[5]  In contrast, under

*Brady*, the question is not whether it is more likely than not that the verdict would

have been different, but whether in the absence of the evidence Petitioner received a

fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles*,

514 U.S. at 434.[6]

On this record, the undersigned finds that assuming the circuit court denied the

claim under the newly discovered evidence standard rather than the *Brady* standard,

the First DCA's affirmance most likely relied on *Brady*.  In his first issue on appeal

from the denial of post-conviction relief, Petitioner argued that the post-conviction

court did not utilize the *Brady* standard of review, but "departed from the essential

---

[5] In *Blanco*, the Florida Supreme Court articulated the standards for evidence to qualify as newly discovered evidence as follows:

> First, to qualify as newly discovered evidence, "the asserted facts 'must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence.'"  Second, to prompt a new trial, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial."

*Blanco*, 702 So. 2d at 1252 (quoting *Jones v. State*, 591 So. 2d 911, 916 (Fla. 1991) (quoting Hallman v. State, 371 So. 2d 482, 485 (Fla. 1979))).

[6] The court notes, however, that there is some overlap between the two standards.  "To meet the materiality prong [under *Brady*], the defendant must demonstrate 'a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial.'" *Wyatt v. State*, 71 So. 3d 86, 102 (Fla. 1st DCA 2011) (quoting *Smith v. State*, 931 So. 2d 790, 796 (Fla. 2006) (citing *Strickler*, 527 U.S. at 289, 296).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (citations omitted).

Case No.: 3:17cv483/LAC/EMT

requirements of law when [it] utilized a newly discovered evidence standard of review for a timely *Brady* violation claim" (Ex. PP at 4). In his *pro se* initial brief, Petitioner argued that "[n]otwithstanding the Court's evaluation of Appellant's claim under the wrong standard, a review of the record in this case will establish that Appellant met his burden under *Strickler* [*v. Greene*, 527 U.S. 263 (1999)], and established his *Brady* claim" (Ex. PP at 14). Petitioner then argued that he had established prejudice under *Brady* at the evidentiary hearing. In the State's answer brief on appeal, it cited the materiality standard in *Brady* and argued that Petitioner's "claim fails regardless over whether one uses the newly discovered evidence standard or the standard for a *Brady* violation" (Ex. QQ at 18).

Given that both parties treated the claim as a *Brady* violation at the evidentiary hearing and explicitly argued *Brady* on appeal, the First DCA most likely adjudicated this claim under *Brady* and determined that Petitioner had not satisfied the *Brady* standard, for the reasons cited by the circuit court. Accordingly, the state court's denial of Petitioner's *Brady* claim in entitled to deference.

A review of the record supports the state court's determination. On March 12, 2015, the circuit court held an evidentiary hearing on six claims in Petitioner's 3.850 motion, including the one raised here. In his motion, Petitioner explained the

significance of the lab report as follows:

> Two of the State's primary witnesses had claimed to see blood or what appeared to be blood either on or inside the Defendant's automobile. Defendant points out that in this case the body of the victim was never located and there was no physical evidence that a crime occurred. Establishing corpus delicti was critical for this Defendant's ultimate conviction. The 'blood' was necessary for finding that the alleged victim had been killed and had been killed by the criminal agency of someone. The blood/appearance of blood was the basis for the arrest warrant, the search warrant, [FN 1] and more than likely, the indictment itself.
>
> [FN 1] The search warrant for the Defendant's car was of vital importance because that search resulted in finding the alleged victim's sandals, which became a focal point of the State's case.

(Ex. MM at 305) (additional footnote omitted). At the evidentiary hearing Petitioner testified that he did not know of the existence of the lab report until after the conclusion of his third trial (Ex. NN at 347–48). He contends that because the victim's body was not found and the cause of death was unknown, testimony at trial that fluid that looked like blood had been found in his car was significant. Petitioner testified:

> First off, when Investigator Boyle came to my home, he said he wanted to talk to me and I didn't want to talk to him. I asked him if he had a warrant and all that and he said no. And later he admitted that he didn't have any basis for—to do anything until he went to my carport and he looked in my car and he seen what would appear to be blood in the car and unknown substance [sic] that were smeared on the hood and trunk of my car. And that gave him the basis to go and get a search warrant because it was supposedly corroborating the statement that Marilyn May

had given him earlier about a murder and such.

(Ex. NN at 348–49).  Petitioner also testified that during his third trial Marilyn May "testified that she had seen blood smeared on my hood of my car" (*id*. at 353). Petitioner explained that it would have been beneficial if he could have presented the lab report to the jury showing that there was no blood or bodily fluids present in the car and that no cleaning fluids were found in the car swabs.  Finally, Petitioner argued that the testimony of Janice Johnson, the crime scene unit supervisor who collected the swabs taken from the car, was detrimental because it provided a theory about why no blood was found on the car.  At trial the prosecutor asked her whether Petitioner would have had time to clean the car, and she stated that he could have.  Petitioner explained the significance of this testimony as follows:

> And that laid the foundation for [the prosecutor] to argue in closing arguments that you heard Ms. Johnson, she didn't find that.  She said that he had time to clean the car up, that's why we don't have any blood there.  And then in the next rebuttal closing argument he states that Ms. May's testimony, she saw the blood and we don't have any physical evidence of that because he had time to clean it up, that's why there's not evidence of that, basically.

(*Id*. at 354).  Petitioner also testified that if the report had been disclosed, the defense could have had the samples retested to determine whether any cleaning fluids were found (*id.* at 357).

Case No.: 3:17cv483/LAC/EMT

A review of the trial transcript shows that the State's primary evidence against Petitioner included sandals identified as belonging to Ms. Holman by several witnesses which were found hidden in Petitioner's car; testimony by Petitioner's aunt, Marilyn May, that Petitioner confessed to killing Ms. Holman and burying her body; testimony by Detective Wayne Orr that Petitioner made statements to him that Ms. Holman was not coming back and that he did not want to hurt anyone else; testimony by three other witness that Petitioner had told them that he should kill Ms. Holman and bury her in the backyard; testimony that Petitioner and Ms. Holman were involved in a verbal and physical altercation on the night before Ms. Holman disappeared; and a taped prison phone call between Petitioner and his girlfriend, Linda Coski, in which Petitioner made statements that Ms. Holman was gone and would not be coming back. The State did not present testimony that lab tests revealed that blood was found in or on Petitioner's car.

In his opening statement at Petitioner's third trial, defense counsel Barry McCleary, addressed the lack of blood evidence as follows:

> She [Ms. May] subsequently testified that she sees what appears to be blood on the hood and the trunk of the car, tells the police this.  We anticipate that there will be evidence to say there was no blood.   There was nothing there, other than what Marilyn May says.

* * *

> Then what we're not going to have is CSI.  Allegedly, [Petitioner] smacked [Ms. Holman] on her face and caused a gash in her face.  Well, the automobile was seized on that Friday or Saturday.  Thoroughly gone over, vacuumed inside and out.  Checked for fingerprints.  Checked for evidence.  There will be no evidence of any blood in the car.  There will be no evidence of any blood on the hood or the trunk.  The only evidence will be a palm print.  There will be no physical evidence, none whatsoever that will be presented in this case that points to the murder of Ms. Holman by Richard Hunter.

(Ex. T at 86;  89–90).  In his closing argument, defense counsel argued:

> Where is the blood?  Where is the blood in the car?  You can see, put into evidence, the evidence card.  You can go through those and see how thorough CSI people were and yet not one piece of physical evidence was ever put into this courtroom from those vacuumings, swabbings, whatever they did, collections.  Not one piece of physical evidence says that Richard Hunter has committed any crime.

(Ex. U at 369).  Throughout the trial in his examination of witnesses, counsel emphasized that there was no blood or any other physical evidence linking Petitioner to the disappearance or murder of Ms. Holman.  The defense attacked the credibility of the State's witnesses and the State's investigation into the crime.  The defense also presented evidence that Petitioner's history of the use of crack cocaine and his use of cocaine and alcohol at the time of the crime rendered any statements he made to others and/or his confession to Ms. May not trustworthy or credible.

In reviewing the evidence and testimony presented in Petitioner's trial, it does not appear that the presence or absence of blood in or on his car was central to

establishing Petitioner's guilt. Two witnesses at trial, both crime scene investigators, testified that they did not observe blood in or on Petitioner's car (*see* testimony of Phillip Davies, Ex. T at 188; testimony of Janice Johnson, Ex. T at 293, 297). Given that the State did not present evidence that blood existed on the car, and defense counsel emphasized that no blood evidence existed, a lab report confirming this fact would have been cumulative to evidence which was presented at trial and would not have affected the outcome of the proceedings. Therefore, Petitioner has not established prejudice under *Brady* with respect to the undisclosed lab report. The state court's rejection of this claim was not contrary to *Brady*, did not involve an unreasonable application of *Brady*, and was not based on an unreasonable determination of the facts. Thus, Petitioner is not entitled to habeas relief on this ground.

Ground One: Sub-claim B:

> "Post-conviction Counsel Was Ineffective For Failing To Investigate And Produce [FDLE Analyst Josephine Roman] To Testify At Petitioner's Evidentiary Hearing"

Within Ground One Petitioner makes a summary allegation that his post-conviction counsel was ineffective for failing to produce Josephine Roman, the analyst who conducted the testing of the swabs taken from his car, at the evidentiary

hearing (ECF No. 1 at 17).  He alleges that his trial counsel could have called Ms.

Roman "to testify at trial to her findings and explain to the jury that the swabs taken

from the car were microscopically analyzed for the presence of blood that would be

unseen by the naked eye.  And that there is almost always evidence of blood left

behind even after a 'clean up'" (ECF No. 1 at 16–17).  Petitioner believes this

testimony would have had a "strong impact" on the jury (*id.*).

Respondent correctly responds that there is no constitutional right to post-

conviction counsel; thus, there is not a cognizable freestanding claim of ineffective

assistance of post-conviction counsel.  *See Pennsylvania v. Finley*, 481 U.S. 551, 555

(1987) (prisoners have no constitutional right to counsel when collaterally attacking

their convictions); *Lambriz v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1262 (11th

Cir. 2014) ("*Martinez* [*v. Ryan*, 566 U.S. 1 (2012)] did not, as Lambrix seems to

suggest, create a freestanding claim for challenging a conviction or sentence based on

the alleged ineffective assistance of state post-conviction counsel.").  Thus, to the

extent that Petitioner is raising a claim of ineffective assistance of post-conviction

counsel, this claim is denied.  Accordingly, Petitioner is not entitled to habeas relief

on this ground.

Ground Two:

> "The Trial Court Erred In Denying Ground Five Of Petitioner's Postconviction Motion After An Evidentiary Hearing Where Trial Counsel Was Ineffective For Failing To Investigate And Prepare For Testimony Of Marilyn May"

Ground Two: Sub-claim A:

In Sub-claim A of his second ground for relief, Petitioner contends that his trial counsel was ineffective for failing to acquire pawnshop records establishing that a bloody ring Ms. May testified Petitioner was wearing when he confessed to her was actually in a pawnshop at the time (ECF No. 1 at 17–18, 28–29).

1.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To obtain relief under *Strickland*, Petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms.  *Strickland*, 466 U.S. at 688–89, 691.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was

unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable

lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the *Strickland* standard, Petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at

694–95. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), *Strickland* prejudice is gauged against the outcome of the trial, not on appeal. *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

2.    Federal Review of State Court Decision

Petitioner exhausted this claim in state court. The post-conviction court denied

relief, and the First DCA per curiam affirmed the denial. The state circuit court

adjudicated the claim as follows:

> Ms. May testified at trial that Defendant was her nephew and that she
> had known him for most of her life. Ms. May said that Defendant
> confessed to her and told her that he had killed the victim. Defendant
> told her that before killing the victim, he had hit her in the face with his
> hand. Because Defendant was wearing a ring, the victim's face was
> injured and he was afraid she would call the police. Ms. May said she
> saw that the ring Defendant was wearing was "full of blood." Ms. May
> said that Defendant told her that after killing the victim by strangling her,
> he then buried her in a "shallow grave that he'd dug with a hammer."
>
> Defendant claims that Ms. May incorrectly testified that Defendant's
> ring was "full of blood." Defendant said he told his attorney that the ring
> was in a pawnshop at the time he allegedly spoke with Ms. May. Mr.
> McCleary denied that Defendant told him the ring was in the pawnshop.
> The Court again finds Mr. McCleary's testimony credible and that the
> issue was never brought to his attention. Defendant has also not
> provided any evidence that the ring was in a pawnshop at the time he
> spoke with Ms. May. Since Defendant cannot show prejudice, the claim
> is denied.

(Ex. OO at 563) (citation to record omitted). The post-conviction court correctly

identified *Strickland* as the federal law governing this claim (*see id.* at 561–62).

Therefore, Petitioner is entitled to relief only if the state court's adjudication of this

claim was contrary to or an unreasonable application of *Strickland* or was based on

an unreasonable determination of the facts in light of the evidence.   Respondent

argues that the state court determination was correct and that the record supports the

determination.

At the evidentiary hearing on his 3.850 motion, Petitioner testified that Ms.

May did not testify about his ring being full of blood until the second trial, which

ended in a mistrial.   Petitioner testified:

> And that's when I asked Mr. McCleary to see about getting the records
> to show that I didn't have no ring.  Because when I was arrested, I had
> no ring, and, you know, there was just no—never any ring, period.  The
> ring was in the pawn shop maybe a couple weeks prior to when she says
> I had it.

(Ex. NN at 380).  Petitioner stated that he did not hear anything more about the issue

from his trial counsel.   Petitioner's trial counsel Mr. McCleary testified at the

evidentiary hearing that when he represented Petitioner in his third trial he had been

practicing law for about twenty years and had served as defense counsel in hundreds

of jury trials (*id.* at 431).   The following testimony was elicited regarding the ring in

question:

> Q. [Petitioner's Post-conviction counsel ]: Right, okay.  And what if
> [Ms. May] had this testimony that she gave in that trial about [Petitioner]
> hitting Mary Holman and busting her face up and blood went
> everywhere, she had—he had a ring full of blood?   And do you

remember Mr. Hunter after that—after that mistrial when that first came
out telling you that, hey, that ring is at the pawn shop?

A. [Mr. McCleary]: No, sir, I do not.

Q.  All right.  And do you remember him telling you or anybody else
which pawn shops it had be in [sic] because that's the only one he used?

A.  I do not.

Q.  Is it possible that he told you and you weren't looking at him and
didn't hear him?

A.  No.

Q.  I mean, that conversation would have taken place probably in the
county jail; is that correct?

A.  Well, if we were at the county jail, we were looking right at each
other because you got to sit right across from each other at a desk.

(*Id*. at 447).[7]

The state court credited trial counsel's testimony that Petitioner never told him

about the ring in question being in a pawnshop.   In reviewing the state court's

reasoning, this court defers to the state court's factual determinations, including its

credibility determinations:

> Determining the credibility of witnesses is the province and function of
> the state courts, not a federal court engaging in habeas review.  Federal
> habeas courts have "no license to redetermine credibility of witnesses
> whose demeanor has been observed by the state trial court, but not by
> them."  *Marshall v. Lonberger*, 459 U.S. 422 (1983).  We consider
> questions about the credibility and demeanor of a witness to be questions
> of fact.  *See Freund v. Butterworth*, 165 F.3d 839, 862 (11th Cir. 1999)
> (*en banc*).  And the AEDPA affords a presumption of correctness to a

---

[7] Trial counsel had acknowledged problem with his hearing, and this line of questioning was
in reference to that condition.

factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e).

*Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011).  *See also*

*Williams v. Johnson*, 845 F.2d 906, 909 (11th Cir. 1988) ("In habeas corpus cases .

. . [i]mplicit findings regarding the credibility of witnesses are included among the

findings that this Court must credit.").   Petitioner has not overcome the presumption

of the correctness of the state court's credibility determination and related findings by

clear and convincing evidence.[8]  Applying *Wilson*'s "look-through" presumption, the

First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not

involve an unreasonable application of *Strickland*, and was not based on an

unreasonable determination of the facts.[9]

---

[8] Accordingly, Petitioner's Motion to Expand the Record with Newly Discovered Evidence ( ECF No. 24), regarding these same pawn shop records, is denied because the state court adjudicated the claim on the merits and federal habeas review is limited to the record presented in state post-conviction court.  *See Cullen v. Pinholster*, 563 U.S. 170, 181–86 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."); *see also, Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254,  1262–63 (11th Cir. 2014); *Frazier v. Bouchard*, 661 F.3d 519, 527–28 (11th Cir. 2011).

[9] On March 15, 2018, after the instant habeas petition was filed, Petitioner filed a Rule 3.850 motion in state court raising a newly discovered evidence claim with regard to the pawn shop records at issue here.  The circuit court summarily denied the motion, finding that it was both time-barred and an abuse of the process because it raised issues which could have been litigated in Petitioner's prior post-conviction proceeding (*see* Attachment A, "Order Denying Motion for Post-Conviction Relief" dated December 5, 2018, at 3 (attachments to this state court Order omitted)). Petitioner has appealed the denial of relief to the First DCA, and the appeal is currently pending (*see*

Ground Two: Sub-claim B

Petitioner next claims that his post-conviction counsel was ineffective in investigating and presenting documents and witnesses to support Petitioner's post-conviction claims (ECF No. 1 at 18).  Respondent contends that Petitioner has not exhausted this issue and that a freestanding claim of ineffective assistance of post-conviction counsel is not cognizable in federal habeas cases.

As explained in Ground One, Sub-claim B, Petitioner's claim of ineffective assistance of collateral counsel is not a cognizable basis for federal habeas relief.  *See* 28 U.S.C. § 2254(i);  *see also Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (prisoners have no constitutional right to counsel when collaterally attacking their convictions).  Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Two: Sub-claim C

Petitioner next claims that his trial counsel was ineffective when he failed to impeach Ms. May with a prior felony conviction (ECF No. 1 at 18–19, 28–29).

1.    Clearly Established Federal Law

The law governing ineffective assistance of counsel claims is set forth *supra*.

---

Case No. 1D19-0492).  This Order is not an adjudication on the merits and, therefore, is not the adjudication subject to review under § 2254(d).

2.    Federal Review of State Court Decision

Petitioner exhausted this claim in state court.  The post-conviction court denied

relief, and the First DCA per curiam affirmed the denial.  The state circuit court

adjudicated the claim as follows:

> With respect to the prior conviction, the Court finds that it should have
> been used to impeach the witness.  The Court, however, also finds that
> the outcome of the proceeding would not have been different had the
> prior conviction been disclosed.  Since, again, Defendant cannot show
> prejudice, this claim is denied.

(Ex. OO at 563).  The post-conviction court correctly identified *Strickland* as the

federal law governing this claim (*see id*. at 561–62).  Therefore, Petitioner is entitled

to relief only if the state court's adjudication of this claim was contrary to or an

unreasonable application of *Strickland* or was based on an unreasonable determination

of the facts in light of the evidence.  Respondent argues that the state court

determination was correct and that the record supports the determination.

At the evidentiary hearing Petitioner testified that he provided his counsel with

a printout showing Ms. May's conviction for aggravated assault and battery (*see* Ex.

NN at 472–74).  However, at the evidentiary hearing Mr. McCleary testified that he

"didn't know about it" (Ex. NN at 446).  Post-conviction counsel also asked Mr.

McCleary if he understood that a witness could be impeached if he or she has a felony

conviction or a conviction for a crime involving dishonesty, and Mr. McCleary testified that he had not been practicing law for about three years, but he "knew that there was only certain things in which you could bring out" (*id.* at 455).

The Florida Evidence Code provides that a party may attack the credibility of any witness by evidence that the witness has been convicted of a crime punishable by more than one year in prison, or a crime that involved dishonesty or a false statement regardless of the punishment. *See* Fla. Stat. § 90.610(1); *Wilcox v. State*, 143 So. 3d 359, 373 (Fla. 2014). This inquiry is generally restricted to the existence and number of prior convictions, unless the witness answers untruthfully. *Jackson v. State*, 25 So. 3d 518, 526 (Fla. 2009). *See also Burst v. State*, 836 So. 2d 1107, 1108 (Fla. 3d DCA 2003) ("The proper method of impeaching a witness with prior convictions is to first ask whether the witness has ever been convicted of a felony. If the witness admits the conviction, the questioner may ask, 'how many times,' and whether the witness has ever been convicted of a misdemeanor involving dishonesty. If the witness denies the conviction, the opposing party may produce the record of conviction.") (citing *Mosley v. State*, 739 So. 2d 672, 675 (Fla. 4th DCA 1999)).

In Petitioner's first trial, his counsel, Harry Stopp, asked Ms. May if she had been convicted of a felony or a crime of dishonesty, and she answered that she "had

a battery" (Ex. G at 234).  Trial counsel then asked if she had not been convicted of

a second battery and she answered that she had (*id.* at 235).  In Petitioner's third trial,

Mr. McCleary did not question Ms. May about whether she had been convicted of a

felony or a misdemeanor involving dishonesty or a false statement.

The state court determined that while trial counsel should have used the prior

conviction to impeach Ms. May, Petitioner had not demonstrated prejudice under

*Strickland*.  The record supports this determination.  Ms. May was an important State

witness who testified that Petitioner confessed to her that he killed Ms. Holman and

buried her in a shallow grave which he dug with a hammer.  In cross-examining Ms.

May, trial counsel attempted to impeach her by questioning the several different

versions of Petitioner's confession which she gave police, including that Ms. Holman

"got in [someone else's] car, that [Petitioner] killed Mary, and [the] CIA offered him

$25,000" to leave her alone (Ex. T at 180–81).  Trial counsel also asked Ms. May

about the "ring full of blood" that she claimed that she saw Petitioner wearing as

follows:

> Q. [Mr. McCleary]: You never said in your deposition or in the police
> report that there was blood on the ring; isn't that correct?
> A. [Ms. May]: Excuse me?
> Q. In the first report to the police officer and then in your deposition you
> never stated that there was blood on the ring, did you?
> A.  I'm not sure if I did or not.  I do remember seeing that.

(*Id*. at 181).  A review of trial counsel's cross-examination of Ms. May shows that he highlighted the inconsistencies in her statements to police and from her prior deposition in order to diminish her credibility.  Petitioner has not demonstrated that impeaching Ms. May with a prior felony would have changed the outcome of the trial when other, arguably more relevant, attempts at impeachment did not result in his acquittal.  Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.  Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Two: Sub-claim D

Petitioner next argues that his counsel was ineffective "for failing to impeach Ms. May with her deal for leniency where she was allowed to plead guilty to a misdemeanor battery instead of being prosecuted for a felony battery" (ECF No. 1 at 19).  Respondent argues that this claim is procedurally defaulted on federal habeas because it was not fairly presented to the state courts.

The record reflects that Petitioner included this claim in his first *pro se* Rule 3.850 filed on November 14, 2011 (Ex. LL1 at 22).  This motion was stricken as facially insufficient.  Petitioner raised the claim again in an amended Rule 3.850

motion filed on February 2, 2012 (Ex. LL2 at 44).  The court struck the amended motion as "abusive of the postconviction system" with leave to amend to "confine his allegations to a reasonable number of claims" (Ex. LL2 at 91–93).  Petitioner again raised this claim in his *pro se* second and third amended Rule 3.850 motions (*see* Ex. LL2 at 101–03; Ex. MM at 245–47).  The court dismissed these motions, and on August 9, 2013, through Mr. Richbourg, Petitioner filed an amended Rule 3.850 motion which did not include this claim (Ex. MM at 303–26).

While at the evidentiary hearing Petitioner testified that he believed Ms. May received special treatment in entering a plea to misdemeanor battery, post-conviction counsel did not question Mr. McCleary regarding this allegation.  In addition, post-conviction counsel did not address the claim in his post-evidentiary hearing memorandum (*see* Ex. NN at 436–53, 455, 475–80).  Finally, the circuit court did not address the allegation in its order denying post-conviction relief (*see* Ex. OO at 560–66).  Although Petitioner argued that the circuit court failed to enter an order on this claim in his *pro se* initial brief on appeal, he did not allege that his post-conviction counsel was ineffective for failing to raise it (*see* Ex. PP at 22–23).

1.    Clearly Established Supreme Court Law

It is a long-standing prerequisite to the filing of a federal habeas corpus petition

that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[10] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, 513 U.S. at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); *Picard*, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In *Picard v. Connor*, the Court held that, for purposes of exhausting state remedies, a claim for relief in

---

[10] Section 2254 provides, in pertinent part:

(b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
    (A)  the applicant has exhausted the remedies available in the courts of the State; or
    (B) (i)  there is an absence of available State corrective process; or
      (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In *Anderson v. Harless*, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.*, 459 U.S. at 7 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Anderson*, 459 U.S. at 7. The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a

reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. *Id*., 459 U.S. at 7 & n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id*.

Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry*, 513 U.S. 364. The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[11] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan*, 513 U.S. at 365–66.

In *Baldwin v. Reese*, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present'

---

[11] The petitioner in *Duncan* raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." 541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004). The *Baldwin* Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.*, 541 U.S. at 32. With regard to this statement, the Eleventh Circuit stated in *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" *McNair* [*v. Campbell*], 315 F. Supp. 2d at 1184 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[12]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review. *Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See Coleman v. Thompson*, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498

---

[12] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id*.

U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal

court must determine whether any future attempt to exhaust state remedies would be

futile under the state's procedural default doctrine. *Bailey*, 172 F.3d at 1303. In the

second instance, a federal court must determine whether the last state court rendering

judgment clearly and expressly stated its judgment rested on a procedural bar. *Id.* A

federal court is not required to honor a state's procedural default ruling unless that

ruling rests on adequate state grounds independent of the federal question. *See Harris*

*v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). The adequacy of

a state procedural bar to the assertion of a federal question is itself a federal question.

*Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state

court's procedural ruling constitutes an independent and adequate state rule of

decision. *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state

court rendering judgment must clearly and expressly state it is relying on state

procedural rules to resolve the federal claim.[13] *Id.* Second, the state court's decision

on the procedural issue must rest entirely on state law grounds and not be intertwined

---

[13] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995); *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994).

with an interpretation of federal law.  *Id.*  Third, the state procedural rule must be

adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must

be firmly established and regularly followed, that is, not applied in an arbitrary or

unprecedented fashion.  *Id.*

      To overcome a procedural default, the petitioner must show cause and prejudice

or a fundamental miscarriage of justice in order for the federal habeas court to reach

the merits of a claim.  *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470.  "For cause to

exist, an external impediment, whether it be governmental interference or the

reasonable unavailability of the factual basis for the claim, must have prevented

petitioner from raising the claim."  *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct.

1454, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106

S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception,

the petitioner must show that "a constitutional violation has probably resulted in the

conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327, 115

S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the

petitioner must show that it is more likely than not that no reasonable juror would

have convicted him."  *Schlup*, 513 U.S. at 327.  Further:

      a substantial claim that constitutional error has caused the conviction of
      an innocent person is extremely rare.  To be credible, such a claim

> requires [a] petitioner to support his allegations of constitutional error
> with new reliable evidence—whether it be exculpatory scientific
> evidence, trustworthy eyewitness accounts, or critical physical
> evidence—that was not presented at trial.

*Id*.  Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence.  *See McQuiggin v. Perkins*, 569 U.S. 383, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013).  As the Court stated in *Schlup,* "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]."  513 U.S. at 332; *see also House v. Bell*, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Because Petitioner did not properly present the claim presented here as Ground Two, Sub-claim D, in state court, this claim is procedurally defaulted.  However, Petitioner asserts that if this claim is subject to procedural default then that default is excused by the ineffective assistance of his post-conviction counsel pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012) (ECF No. 23 at 14).

As previously discussed, a federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right.  *Wainwright v. Sykes*, 433

U.S. 72, 84–85 (1977).  To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court."  *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray*, 477 U.S. at  488).   Before its 2012 decision in *Martinez*, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause.  *See Coleman*, 501 U.S. at 752–53.  *Martinez* created a limited, equitable exception to *Coleman* where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* [*v. Washington*, 466 U.S. 668 (1984)]"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one."  *Martinez*, 566 U. S. at 14 (citations omitted).  Accordingly, the petitioner must "establish that his collateral counsel's conduct 'fell below an objective standard of reasonableness,' and that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Hittson v. GDCP Warden*, 759 F.3d 1210, 1262 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 688).

In *Hittson*, the Eleventh Circuit explained:

[T]he merits of the underlying claim is only a part of the *Strickland* analysis. With unlimited time and the benefit of hindsight, a petitioner can come up with any number of potentially meritorious ineffective-assistance claims that he now wishes his collateral counsel had raised. However, a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims. *Murray*, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983). "[A] per se rule that . . . the professional advocate, [is not] allowed to decide what issues are to be pressed . . . seriously undermines the ability of counsel to present the client's case in accord with counsel's professional evaluation." *Id.* at 751, 103 S. Ct. at 3313.

As we have explained, *Strickland* instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"—that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689–90, 104 S. Ct. at 2065–66. To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Thus, to show that his habeas counsel failed to provide the level of representation required by *Strickland*, [the petitioner] must show more than the mere fact they failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

*Hittson*, 759 F.3d at 1263 (footnote omitted).

The Eleventh Circuit then explained *Martinez*'s "substantial claim" requirement:

> *Martinez* articulated the "substantial claim" requirement as follows:
>
> To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Cf. Miller–El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).
>
> *Martinez*, — U.S. at —, 132 S. Ct. at 1318–19. Neither *Martinez* nor *Trevino* [*v. Thaler*, — U.S. —, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013)] elaborated on or applied this standard, but we take the Court's reference to *Miller–El* to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).
>
> As the Court explained in *Miller–El*, "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." 537 U.S. at 327, 123 S. Ct. at 1034. Where a petitioner must make a "substantial showing" without the benefit of a merits determination by an earlier court, he must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000). That does not mean that a petitioner must show "that some jurists would grant the petition." *Miller–El*, 537 U.S. at 338, 123 S. Ct. at 1040. "[A] claim can be debatable even though

every jurist of reason might agree, after the . . . case has received full consideration, that petitioner will not prevail." *Id.*

We observe that this standard is similar to the preliminary review conducted by district judges in § 2254 proceedings. Rule 4 of the § 2254 Rules allows the district judge to summarily dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." The Advisory Committee Notes further instruct that, in keeping with the heightened, fact-pleading requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error." Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in . . . the § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from *Strickland*.

*Hittson*, 759 F.3d at 1269–70 (footnotes omitted).

2.     Federal Review of State Court Decision

At Petitioner's first trial his counsel, Mr. Stopp, in cross-examining Ms. May, asked her, "did the State Attorney's Office offer you special treatment in your recent battery case to testify?" (Ex. G at 234). Ms. May responded several times that they did not (*id*. at 234–36). On redirect examination, the following exchange occurred between Ms. May and the prosecutor at Petitioner's first trial, David Rimmer:

Q. [Mr. Rimmer]: You were asked about the disposition of your battery case.

A. [Ms. May]: Yes.
Q. And you indicated that you got no special treatment from the State
Attorney's Office?
A. Correct.
Q. I was not your prosecutor, was I?
A. No, you were not.

(*Id*. at 240).  In Petitioner's third trial, Mr. McCleary did not question Ms. May on this

point.

At the evidentiary hearing on Petitioner's Rule 3.850 motion, Mr. McCleary

testified that he had read the previous trial transcripts "more than once" and that he

had a voluminous computer file that contained "every testimony of every witness.

Everything that I could find a contradiction in, I had it in my computer.  I had the page

number and I had whether it was in the [first] trial or the other.  So as far as

preparation goes, I was prepared for this trial" (Ex. NN at 438).  He also testified:

> I listened to Mr. Hunter.  I had gone over the previous trial with Mr.
> Stopp many times in the office.  I had the ability to read all the
> transcripts of the previous trials.  I had the ability to read all the
> testimony of Mr. Hunter, all right, and I was making up a trial strategy
> that I thought was in Mr. Hunter's best interest.

(Ex. NN at 452).  Given that trial counsel was familiar with the first trial and with Mr.

Stopp's cross-examination of Ms. May, his decision not to examine Ms. May on this

point must have been a strategic one.  And "strategic choices made after thorough

investigation  of  law  and  facts  relevant  to  plausible  options  are  virtually

unchallengeable. . . ." *Strickland*, 466 U.S. at 690. Petitioner has not demonstrated that his trial counsel was ineffective in failing to question Ms. May as to whether she received leniency for her testimony against him. Ms. May testified several times in the first trial that she had not received any special treatment. It would have been reasonable to conclude that her testimony would have remained the same in the third trial. In addition, Petitioner has not proven that Ms. May did in fact receive favorable treatment for testifying against him. As discussed in Ground 2, Sub-claim C, *supra*, Petitioner's trial counsel attempted to impeach Ms. May with her inconsistent statements and the discrepancies in her version of events, yet Petitioner was still convicted of the crime. An allegation of leniency in the prosecution of an unrelated offense, without proof, is unlikely to have undermined her credibility with the jury.

Petitioner has failed to demonstrate that the *Martinez* exception applies because he has not shown that his ineffective assistance of counsel claim is substantial and has merit. Specifically, Petitioner has failed to satisfy either of *Strickland*'s prongs with regard to this claim of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 686. Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Two: Sub-claim E

Petitioner next alleges that his post-conviction counsel was ineffective in failing

to raise a claim that his trial counsel was ineffective for failing to impeach Ms. May with the perjury she allegedly committed during a pretrial deposition (ECF No. 1 at 19).

Similar to the claim raised in Sub-claim D, Petitioner raised this issue in his three *pro se* Rule 3.850 motions, but his post-conviction counsel did not raise it in the counseled amended motion. Respondent argues that this claim is procedurally defaulted on federal habeas because it was not fairly presented to the state courts. Petitioner again argues that he is entitled to review of his claim because the *Martinez* exception to the procedural default doctrine applies.

1.    Clearly Established Federal Law

The law governing procedural default is set forth *supra*.

2.    Federal Review of State Court Decision

Petitioner argues that his trial counsel was ineffective in failing to impeach Ms. May with the perjury he alleges she committed during her 2004 deposition pertaining to the existence and timing of her third battery conviction. Ms. May was not asked in the portion of her deposition which Petitioner attaches to his petition if she had ever been convicted of a felony (*see* Ex. A, ECF No. 1 at 35–37). She was simply asked if she had ever been arrested. Ms. May answered that she believed that she was arrested for three batteries and for possession of a controlled substance, which the State did not

prosecute (*id*. at 36). She stated that she believed her last battery conviction was three years ago or in 2001; however she also stated, "I'm not real sure about the time frame just off the top of my head. I don't study all that. It's done. I did my time. It's done" (*id*. at 37).

Given trial counsel's familiarity with the discovery conducted in the case, and Ms. May's deposition in particular, in which her testimony is somewhat equivocal with respect to the nature and timing of her prior record, Petitioner has not demonstrated that his counsel's decision not to question Ms. May on her alleged perjury was not a strategic one. And "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. . . ." *Strickland*, 466 U.S. at 690.

Petitioner again has failed to demonstrate that the *Martinez* exception applies because he has not shown that his ineffective assistance of counsel claim is substantial and has merit. Specifically, Petitioner has failed to satisfy the *Strickland* standard with regard to this claim of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 686.

Ground Two: Sub-claim F

In this sub-claim, Petitioner asserts the following:

Next, post-conviction counsel failed to raise the claim that trial counsel

failed to impeach Ms. May's credibility with her bias towards Petitioner concerning a heated argument that she had with Petitioner just months before his arrest. In her deposition Ms. May testified that she told people that Petitioner had busted the "Sand Shaker" cocaine ring on Pensacola Beach. She came to this conclusion simply because of Petitioner's arrest in Lake Charles, LA and his subsequent bond reduction. Petitioner had a heated argument with Ms. May about her falsely accusing him and telling people that he was a snitch. This ill will was still present up until Ms. May accused Petitioner of murder.

(ECF No. 1 at 19–20) (citations to exhibits omitted). Similar to the claims raised in Sub-claims D and E, Petitioner raised this issue in his three *pro se* Rule 3.850 motions, but his post-conviction counsel did not raise it in the counseled amended motion. Respondent argues that this claim is procedurally defaulted on federal habeas because it was not fairly presented to the state courts. Petitioner concedes that the claim is unexhausted and procedurally defaulted, but again argues that he is entitled to review of his claim because the *Martinez* exception to the procedural default doctrine applies.

1.    Clearly Established Federal Law

The law governing procedural default is set forth *supra*.

2.    Federal Review of Claim

During Petitioner's third trial, the prosecutor asked Ms. May on redirect examination whether she had had any falling out with Petitioner. She responded, "I've not had any problems with him. He made a sexual advance on me at the age [her age] of 14. Other than that, we've never had no cross words. We've got along fine" (Ex.

T at 184).

In the portion of Ms. May's deposition which Petitioner attached to his petition, Ms. May was asked if she recalled telling her friends that Petitioner had "been snitching on people and responsible for busting the Sandshaker cocaine ring?" (Ex. A, ECF No. 1 at 44). She responded, "I said I found it kind of strange that every time he gets in this trouble, he walks." (*id*). Ms. May later elaborated:

> Did I say something about Sandshaker? Yeah. He went to jail down in Lake Charles, and everybody thought it was a $10,000 bond. And all of a sudden, his bond is dropped to $275. Yeah, I have a little concern about who does he know and what's going on, because he's messed around with stuff like that for years. And he always seems to get out of the tights, and he may get out of this tight. I don't know.
>
> I don't wish no ill of him, don't get me wrong. I love my nephew. I don't condone what he did. It's not right. There are other ways to leave your lover.

(*Id.* at 45). A review of trial counsel's cross-examination of Ms. May demonstrates that he asked her about statements she made in her deposition that differed from her statements in police reports and in her testimony (*see e.g.*, Ex. T at 155, 180–81). Because counsel was clearly familiar with Ms. May's deposition, it is reasonable to conclude that he made a strategic decision about which topics from her deposition to question her about, and which topics to not question her about—including a strategic decision to refrain from questioning Ms. May about a subject that was intertwined with

Petitioner's arrest in another state and his purported knowledge of the inner-workings of cocaine ring on Pensacola Beach.  And "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. . . ." *Strickland*, 466 U.S. at 690.  Petitioner again has failed to demonstrate that the *Martinez* exception applies because he has not shown that his ineffective assistance of counsel claim is substantial and has merit.  Specifically, Petitioner has failed to satisfy *Strickland*'s performance prong with regard to this claim of ineffective assistance of counsel.  *See Strickland*, 466 U.S. at 686.

Ground Two: Sub-claim G

In Petitioner's next ineffective assistance of counsel claim, he alleges that his trial counsel was ineffective for failing to file a motion in limine to prevent Ms. May from testifying that he had made a sexual advance on her when she was fourteen years old (ECF No. 1 at 20).

1.    Clearly Established Federal Law

The law governing ineffective assistance of counsel claims is set forth *supra*.

2.    Federal Review of State Court Decision

Petitioner raised this claim in Ground Five of his counseled amended Rule 3.850 motion.  Petitioner testified about the allegation at the evidentiary hearing held on his motion; however, his post-conviction counsel did not question his trial counsel about

the allegation nor did he address it in his post-hearing memorandum (*see* Ex. NN at 430–55, 475–80).  The state circuit court failed to address the claim expressly in its order denying post-conviction relief (*see* Ex. OO at 560–66).

In his *pro se* initial brief on appeal, Petitioner asserted that the circuit court failed to address the claim and sought reversal of the post-conviction order (Ex. PP at 26).  The State addressed the claim on the merits in its answer brief, arguing that Petitioner had not demonstrated that, but for any error, the result of the proceeding would have been different (Ex. QQ at 22).  Petitioner addressed the merits of the claim in his reply (Ex. RR at 8–10).  The First DCA per curiam affirmed without opinion (Ex. SS).  Therefore, the appellate court may have affirmed Petitioner's conviction based on the State's argument.[14]

If the appellate court adjudicated the claim on the merits, its adjudication of this

---

[14] Moreover, under Florida law, a district court of appeal does not have jurisdiction to review a non-final order on a Rule 3.850 motion which does not dispose of all of the claims.  *See Hanner v. State*, 228 So. 3d 1161 (Fla. 1st DCA 2017) (per curiam) (dismissing an appeal on a Rule 3.850 motion for lack of jurisdiction because the post-conviction court ruled on only three out of six claims).  *See Lake v. State*, 53 So. 3d 1125, 1126 (Fla. 1st DCA  2011) ("It is well-settled that an order disposing of some, but not all of the claims in a motion for postconviction relief is not an appealable final order."); Fla. R. Crim. P. 3.850(f)(4) ("An order that does not resolve all the claims is a nonfinal, nonappealable order . . . ."); *Bachman v. State*, 253 So. 3d 1250 (Fla. 1st DCA 2018) (same).  It cannot be presumed that the state appellate court would not have followed its own jurisdictional rules.  *See* Fla. R. App. P. 9.030(b)(1)(A); 9.140(b)(1)(D).  Because the First DCA did not dismiss the appeal for lack of jurisdiction, in light of Petitioner's assertion that the circuit court failed to rule on his claim, it necessarily rejected Petitioner's argument and adjudicated the claim on the merits under § 2254(d).

claim is entitled to deference under the AEDPA.  The state court need not issue an

opinion explaining its rationale in order for the state court's decision to qualify as an

adjudication on the merits.  Under *Richter*, the First DCA's summary rejection of this

claim warrants deference under 28 U.S.C. § 2254(d).  *See Richter*, 562 U.S. at 99–100

("When a federal claim has been presented to a state court and the state court has

denied relief, it may be presumed that the state court adjudicated the claim on the

merits in the absence of any indication or state-law procedural principles to the

contrary.").

At Petitioner's first trial, his trial counsel, Mr. Stopp, asked Ms. May the

A review of the record supports a determination that Petitioner's claim is without

merit.  At Petitioner's trial, the prosecutor asked Ms. May if she had ever had a falling

out or problem with Petitioner.  She answered, "I've not had any problems with him.

He made a sexual advance on me at the age of 14.  Other than that, we've never had

no cross words.  We've got along fine" (Ex. T at 184).  Mr. McCleary did not object

and no other testimony was elicited on this subject by either counsel.

At Petitioner's first trial, his trial counsel, Mr. Stopp, asked Ms. May the

following question on cross-examination, "[a]t one time, you had a sexual relationship

with Rick Hunter?" (Ex. G at 238).  The prosecutor immediately objected and at a

sidebar, Mr. Stopp explained that Petitioner and Ms. May had a sexual relationship that

ended "not very well," and he wanted to ask the question to expose her bias (*id*.).  The

prosecutor withdrew his objection and the following exchange took place:

> Q. [Mr. Stopp]: Yes, ma'am?
> A. [Ms. May]: Yes, he tried to approach me whenever I was 14 years old,
> with sexual advances.
> Q. Okay.  And he was a teenager, too?
> A.  Yeah.  He's a couple of years older than me, about 18 months.
> Q.  And you've held that grudge against him since that time?
> A.  No.  As a matter of fact, me and him's never had any differences until
> now.

(*Id.* at 239–40).

As discussed *supra*, Mr. McCleary testified at the evidentiary hearing that he had familiarized himself with prior trial transcripts and discovery.  While Petitioner argues that Ms. May's testimony "portrayed [him] as an incestuous pervert with a history of sexual misconduct" (ECF No. 1 at 20), trial counsel could have just as easily determined that the jury would conclude that Ms. May was biased against Petitioner based on this incident and thus discredit her testimony.  Again, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. . . ." *Strickland*, 466 U.S. at 690.  In addition, because this allegation was remote in time and was not elaborated on during the trial, Petitioner has not demonstrated that this isolated statement evidences a history of sexual misconduct or that the outcome of Petitioner's trial would have been different if trial counsel had filed a motion in limine to exclude it.

Case No.: 3:17cv483/LAC/EMT

Petitioner has not demonstrated that the state court's rejection of his claim was contrary to *Strickland*, or involved an unreasonable application of *Strickland*, or was based on an unreasonable determination of the facts. Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Three:

> "The Trial Court Erred In Denying Ground Six of Petitioner's Postconviction Motion After An Evidentiary Hearing Where Trial Counsel Was Ineffective For Eliciting Very Damaging Testimony; For Failing To Object To Hearsay Testimony And Prosecutor's Comments On Defendant's Silence; And For Failing To Object To Prosecutor's Improper Cross-Examination"

Ground Three: Sub-claim A

In this ground Petitioner alleges that his post-conviction counsel was ineffective for failing to raise a claim that his trial counsel was ineffective in failing to file a pretrial motion in limine to prevent a State's witness, "Julie Faulkner, from testifying that she went with petitioner and Ms. Holman to Dodges Chicken Store where Petitioner stole beer and gas, then traded the beer for crack cocaine" (ECF No. 1 at 21, 29). Petitioner argues that this testimony had no relevance to the murder charge, but was elicited to show that Petitioner had the propensity to commit crime and to diminish his character and credibility with the jury.

1.    Clearly Established Federal Law

The law governing procedural default is set forth *supra*.

Case No.: 3:17cv483/LAC/EMT

2.    Federal Review of Claim

Petitioner raised this claim in his three *pro se* Rule 3.850 motions, but his post-conviction counsel did not raise it in the counseled amended motion.  Respondent argues that this claim is procedurally defaulted on federal habeas because it was not fairly presented to the state courts.  Petitioner concedes that the claim was not exhausted, but again relies on *Martinez* to excuse his procedural default.

At Petitioner's third trial, the State called Julie Faulkner, who attended a party on July 10, 2004, the last night Ms. Holman was seen alive.  Ms. Faulkner testified that both Ms. Holman and Petitioner were at this party, but she had never met either one before (Ex. T at 99–100).  Relevant to this claim, Ms. Faulkner testified that she left the party with Petitioner and Ms. Holman in Petitioner's car and went to Dodge's Chicken store because she wanted some cigarettes.  Ms. Faulkner indicated that she had been drinking and that Ms. Holman was intoxicated (Ex. T at 117).  She believed that Petitioner was in a mean mood.  She continued:

> I stayed in the car and I gave them the money to get my cigarettes because they were going in.  I thought they were going in to prepay for the gas and apparently they stole some beer and filled up the tank and took off, which I didn't know about.  And then the fighting began.

(Ex. T at 117–18).  Ms. Faulkner testified that she later learned that Petitioner stole the beer to sell it to someone else for crack cocaine (Ex. T at 119).

Case No.: 3:17cv483/LAC/EMT

Trial counsel laid out part of his defense strategy in his opening statement at trial, arguing that the jury needed to evaluate the evidence through the lens of Petitioner's drug use and the drug scene in which he and the victim were involved. Counsel argued:

> My client is innocent until proven guilty. Remember what Mr. Molchan [the prosecutor] just said and what I'm about to say is not evidence. It's not what we think the evidence will show. You as jurors will receive the evidence from that witness stand there and make your own determination. But I believe what the evidence is going to show is a bizarre facet of life that probably none of y'all could even imagine, let alone be a part of. We're going to be talking about drugs. We're going to talk about alcohol abuse. There's probably going to be some system—or some allegations of abuse. But I think what we'll see is we start on a Friday morning. Mr. Hunter, Mary, and possibly one other lady start partying—having a party, okay. That this continues all the way through Saturday. Drinking, smoking crack, stealing; all of this is going to take place in the next 72 hours.

(Ex. T at 79–80). Trial counsel then explained the time line of events which took place over the next few days, including Petitioner's drug use and how it may have affected his behavior and perceptions. Relevant to Petitioner's confession to Ms. May, trial counsel stated:

> The testimony that when Richard is on crack or sleep deprivation that sometimes he hallucinates. It's just not him. It's most anybody that [is] doing this type of drug; and sometimes they say things that are inconsistent with each other.
>
> I believe Sheila Hunter will state that she didn't know if Richard was drinking and drugging. If he was, you didn't know if you could believe

him or not is one of the reasons they waited a couple more days before
they called the police.

(Ex. T at 87).  Trial counsel called an expert witness, John Bingham, a licensed mental

health counselor, to explain to the jury the effects of using crack cocaine, including

issues with the perception of reality and sleep deprivation (*see* Ex. U at 320–33).  The

prosecutor questioned Dr. Bingham about whether a person's perception of reality is

impaired if he appears to behave as if he knows that stealing beer is wrong by

acknowledging the theft with the clerk on duty and running out of the door (Ex. U at

334).  Trial counsel followed up on that point in the following exchange:

> Q. [Mr. McCleary]: Somebody that's on crack cocaine, would their
> perception of fear be less in a situation where they were going in to do
> something wrong?
> A. [Dr. Bingham]: Well, first of all, you know, the fear there is very—the
> fear is a protective thing for us.  And many times with something as
> powerful as cocaine—crack cocaine, that emotion is totally overridden
> because the executive functioning is not working properly.  We are not
> making use of systems that help us stay in a protective situation.
> Look at the different places that people that are addicted to crack cocaine
> will go to buy it.  Look at the things that they will do, the harm—or in
> harm's way that they'll place themselves to become hurt and do get hurt
> and then go back and use it again or get it again.  That's the part that the
> cocaine that is demanding the craving that it occurs to satisfy that craving.
> They will return time and time again, expend everything that they have,
> borrow money until they have nothing else to use until they can come up
> with another way of obtaining it.  That's why so many times we have
> these drug-related offenses of stealing and things to sell the money to get
> the cocaine.  Nothing else matters but to get that.

(Ex. U at 337–38).

Case No.: 3:17cv483/LAC/EMT

At the evidentiary hearing, Mr. McCleary testified, "[i]n my opinion, the case hinged around Mr. Hunter's alleged confession to other persons. What had to be done was to show that those statements were not true or that there was enough doubt that there was insufficient evidence to prove him guilty beyond a reasonable doubt" (Ex. NN at 433–34). All of the testimony presented about Petitioner's drug use supported the defense strategy that Petitioner's confession to Ms. May was not reliable because of his drug use. In light of this defense strategy, trial counsel's decision not to file a motion in limine to prevent Julie Faulkner's testimony about the incident at Dodge's Chicken is not deficient performance.

Therefore, Petitioner again has failed to demonstrate that the *Martinez* exception applies because he has not shown that his ineffective assistance of counsel claim is substantial and has merit. Specifically, Petitioner has failed to satisfy *Strickland*'s performance prong with regard to this claim of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 686. Petitioner is not entitled to habeas relief on this ground.

Ground Three: Sub-claim B

Petitioner next argues that his trial counsel was ineffective in calling Jacqueline Torres as a witness to corroborate Ms. Faulkner's testimony that he came into the convenience store where she worked and stole beer and was drunk and rude to her (ECF No. 1 at 21).

Case No.: 3:17cv483/LAC/EMT

1.    Clearly Established Supreme Court Law

The law governing ineffective assistance of counsel claims is set forth *supra*.

2.    Federal Review of State Court Decision

Petitioner exhausted this claim in state court.  The post-conviction court denied relief, and the First DCA per curiam affirmed the denial. The state circuit court adjudicated the claim as follows:

> Defendant next alleges that his attorney brought out testimony at trial that should not have been admitted.  Jacqueline Torres testified at trial that she was a clerk at a Tom Thumb store and that Defendant had taken beer from the store without paying.   Mr. McCleary testified at the evidentiary hearing that he called her to show that the victim was not with Defendant at the time he allegedly killed her.   Since this was a reasonable strategic decision, counsel cannot be held ineffective on this claim.

(Ex. OO at 563–64).  The post-conviction court correctly identified *Strickland* as the federal law governing this claim (*see id*. at 561–62).  Therefore, Petitioner is entitled to relief only if the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence.   Respondent argues that the state court determination was correct and that the record supports the determination.

At Petitioner's trial, trial counsel called Ms. Torres as a witness and questioned her about Petitioner coming into the convenience store where she worked on the night that Ms. Holman disappeared.  The following exchange occurred:

Q. [Mr. McCleary]: How was his walk at that time?

A. [Ms. Torres]: Like a drunk person.

Q. Okay.  How about his speech?

A. Angry.

Q. Was it slurred or stuttered?

A. I'm not really sure.  He just asked to use my bathroom.

Q. Did you believe him to be intoxicated?

A. I was a little concerned when he walked in and the way he presented himself, yes.

Q. And did he also take something from your store?

A. Yes, a case of beer.  I'm not sure of the size.  I think it was one of the 24-packs.

Q. Did he have a white female with him at that time?

A. I remember looking over.  There was a window on the side of the building right by the register.  And I remember, while he was still in the restroom, looking over and seeing a female in his car, yes.

(Ex. U at 248).

At the evidentiary hearing on Petitioner's 3.850 motion, Mr. McCleary was

asked about his calling Ms. Torres as a witness as follows:

Q. [Mr. Richbourg]: Do you remember who she was?

A. [Mr. McCleary]: Sure.  She was the lady—the lady that said that [Petitioner] drove off without paying for the gas and taking the things out of the store.

Q.  Was there some tactic or something to call her?

A. I believe it was to show who was in the car and who wasn't in the car. Mary was not in the car, if I recall that, all right.  And my tactic was I wanted to show that they were not together at that time as the allegations were being made.

(Ex. NN at 448–49).  As explained *supra*, a major part of the defense's strategy was

to focus on Petitioner's intoxication and drug use.  Ms. Torres testified that Petitioner

appeared intoxicated when he came into her store which helped further that defense strategy. Trial counsel could have also believed that calling Ms. Torres supported his contention that Petitioner was not acting rationally in so obviously stealing from the convenience store. Moreover, Defense counsel testified there were strategic reasons behind his decision to call Ms. Torres (including, to show who was in the car when he went to the convenience store). This explanation was credited by the circuit court. Petitioner has not demonstrated that this was not a strategy that any competent counsel would have employed, as the testimony bolstered the defense. In addition, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 956 (11th Cir. 2006) (citation and quotation marks omitted). Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts. Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Three: Sub-claim C

Petitioner next alleges that his trial counsel was ineffective for calling Linda Coski "to testify that Petitioner threatened to kill her and bury her in the backyard, got her hooked on crack cocaine, and that she was scared of Petitioner, especially when he

was drinking" (ECF No. 1 at 21–22, 29–30).

> 1.    Clearly Established Supreme Court Law

The law governing ineffective assistance of counsel claims is set forth *supra*.

> 2.    Federal Review of State Court Decision

Petitioner exhausted this claim in state court. The post-conviction court denied

relief, and the First DCA per curiam affirmed the denial. The state circuit court

adjudicated the claim as follows:

> Defendant also alleges that his attorney erroneously elicited testimony
> from Linda Coski who said that Defendant was dangerous when he was
> under the influence of cocaine and had threatened to kill her on various
> occasions. When asked at the evidentiary hearing if there was a reason
> he questioned Ms. Coski about Defendant's behavior, Mr. McCleary said
> that it was to demonstrate that Defendant's threats of violence were not
> serious. Since, again, defense counsel's strategy was reasonable, the
> Court finds that he was not ineffective as a matter of law on this issue.

(Ex. OO at 564) (citation to record omitted). The post-conviction court correctly

identified *Strickland* as the federal law governing this claim (*see id*. at 561–62).

Therefore, Petitioner is entitled to relief only if the state court's adjudication of this

claim was contrary to or an unreasonable application of *Strickland* or was based on an

unreasonable determination of the facts in light of the evidence. Respondent argues

that the state court determination was correct and that the record supports the

determination.

At trial, Mr. McCleary questioned Ms. Coski about instances when Petitioner would say things that were not true when he was under the influence of crack cocaine. The State objected to the relevance of this testimony and counsel explained that he wanted to demonstrate Petitioner's behavior when he was under the influence of cocaine.  Mr. McCleary stated, "[i]f they don't tell the truth, if they hallucinate, the whole case is based upon—this whole case is based upon a statement that [Petitioner] made while he was under the influence of drugs.  That's the major part of our defense" (Ex. U at 314–15).  Mr. McCleary then asked Ms. Coski if Petitioner ever told her that he was going to kill her and bury her in the backyard, and Ms. Coski replied, "[a]t times" (*Id*. at 316).  On cross-examination, the prosecutor asked Ms. Coski "[a]nd as far as him telling you he was going to bury you in the backyard, did that scare you, concern you?" (*Id.* at 317).   Ms. Coski replied, "[a]t times, yes, but--" and the prosecutor cut off her answer and stated that he had no more questions.

At the evidentiary hearing on Petitioner's 3.850 motion, Mr. McCleary was asked if there was a reason to call Ms. Coski as a witness.  He explained as follows:

> Sure.  Sure there was.  Okay.  First of all, I went all over all the transcripts of the previous trial and all the depositions, all right.  It was my trial strategy at the time to create reasonable doubt with prior inconsistent statements with all those—all those witnesses.  I went through every one of them.  There was no doubt that the statement that Mr. Hunter made to the alleged victim about burying her or taking her out in the backyard was going to come in.  So, therefore, I felt if that testimony came in and I

could show this is just something that Mr. Hunter would say and really
had no merit to it, nor did it have any validity.

(Ex. NN at 432–33).  Given the entirety of Ms. Coski's testimony, it is evident that trial

counsel questioned her about statements made by Petitioner to show a larger pattern

of behavior that Petitioner said things that were not true when he was using crack

cocaine.  In doing so, counsel was trying to diminish testimony from other witnesses

that Petitioner told them he was going to bury Ms. Holman in the backyard and to

diminish the credibility of his confession to Ms. May.  Petitioner has not demonstrated

that given the facts of the case, this strategy was unreasonable.  Applying *Wilson*'s

"look-through" presumption, the First DCA's rejection of Petitioner's claim was not

contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and

was not based on an unreasonable determination of the facts.  Therefore, Petitioner is

not entitled to habeas relief on this ground.

Ground Three: Sub-claim D

Petitioner next claims that his trial counsel was ineffective in failing to refile a

motion in limine and to object at trial to preserve the issue regarding Julie Faulkner's

hearsay testimony that she heard Ms. Holman tell Petitioner, "'You're going to kill me

just like you said you were'" (ECF No. 1 at 22, 30).

1.    Clearly Established Supreme Court Law

The law governing ineffective assistance of counsel claims is set forth *supra*.

2.    Federal Review of State Court Decision

Petitioner exhausted this claim in state court.  The post-conviction court denied

relief, and the First DCA per curiam affirmed the denial. The state circuit court

adjudicated the claim as follows:

> Defendant also argues that Julie Faulkner's testimony at trial that the
> victim said to Defendant that he was going to kill her was inadmissible
> hearsay.   Julie Faulkner testified at trial that, prior to the victim's
> statement, Defendant was hitting the victim and pulling her hair causing
> her to cry and scream.  Although hearsay, the statement from the victim
> heard by Ms. Faulkner was admissible as an excited utterance and any
> objection to the statement would have been overruled.   This claim,
> accordingly, is denied.

(Ex. OO at 564) (citations omitted). The post-conviction court correctly identified

*Strickland* as the federal law governing this claim (*see id*. at 561–62).  Therefore,

Petitioner is entitled to relief only if the state court's adjudication of this claim was

contrary to or an unreasonable application of *Strickland* or was based on an

unreasonable determination of the facts in light of the evidence.  Respondent argues

that the state court determination was correct and that the record supports the

determination.

Prior to his first trial, Petitioner's counsel filed two motions in limine to exclude

Ms. Holman's statement as hearsay (Ex. A at 75–77, 110–11).  After a hearing, the

court reserved ruling and the parties submitted supplemental written arguments (Ex. C at 388, 393–98, 402–03). The motion was addressed again both prior to and after jury selection and prior to the first trial commencing on March 21, 2006 (*see* Ex. F at 4–8, 116–19 & Ex. G at 128–29). At that trial, Ms. Faulkner testified that she left a party and went to a convenience store with Petitioner and Ms. Holman. She described an altercation between the two as follows:

> They started arguing, and Mary tried to get out of the car and Rick pulled her in with—by her hair and started—and hitting on her. And Mary said to him, "You're gonna kill me like you said you're gonna do."

(Ex. G at 189). Ms. Faulkner testified that Ms. Holman was screaming and upset. Ms. Faulkner then testified that Petitioner stopped the car and Ms. Holman got out, but Petitioner got her back in the car and continued to beat her inside the car (*id*. at 190–91). After hearing Ms. Faulkner's testimony, the court overruled Petitioner's hearsay objection (*id*. at 189–90).

At Petitioner's third trial, the following testimony was presented relevant to this claim:

> Q. [Mr. Molchan]: Now when you left the store where was—where were the positions of everybody, as far as seated in the car? Who was driving?
> A. [Ms. Faulkner]: Rick Hunter was driving and Mary was in the passenger seat and I was in the back seat.
> Q. And as you were leaving, did you observe any disagreement between Mr. Hunter, the defendant, and Mary Holman?
> A. Yes, I did. I didn't know what it was all about, but he was hitting on

her and pulling her hair and screaming at her.

Q. At the time he was doing this, I mean, talk about—how was he striking her?

A. With his hand, and he was—he punched her.

Q. And you indicated he pulled her hair or something like that?

A. Yes. He pulled the back of her hair and he was pulling it and he took her arm and twisted it behind her back.

Q. Was she saying anything? Or was she crying?

A. Yes, she was she was [sic] crying and they're screaming and she said, you're going to kill me like you said you were.

Q. Did she appear upset?

A. Very upset. And she wanted out and he wouldn't let her out, and I was stuck in the back seat.

Q. Now did she try to get out of the car?

A. Twice, yes.

Q. What did he do?

A. He pulled her back in. The first time the car was going when she was trying to get out and he pulled her back in. The second time we were stopped at a light and she tried to get out and he wouldn't let her get out.

Q. Did he use any physical force?

A. And he physically forced her and grabbed her by the hair and then started beating her in her back.

Q. And this was all inside the car?

A. Yes.

(Ex. T at 118–19). At the evidentiary hearing on Petitioner's 3.850 motion, Mr. McCleary acknowledged that Ms. Faulkner's testimony was damaging, but stated that Mr. Stopp's motion in limine had been denied and that he adopted all of his motions. He explained, "[a]nd my recollection of the Court was that they rendered the same decision on all the other motions that were previously made in the first trial. There were certain specific motions that were actually reheard again with evidence or

whatever, and, again, the Court ruled on those" (Ex. NN at 441).  He was asked why he made no objection to the testimony at trial and explained, "if the Court had already ruled on it, I'm pretty sure I would not have objected to it" (*Id*.).

In denying this claim the circuit court determined that Ms. Holman's statement was an excited utterance exception to the hearsay rule and was, thus, admissible. Therefore, any objection that trial counsel would have made would have been overruled, and he was not ineffective in failing to make the objection.  *See Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); *see also* Fla. Stat. § 90.803(2) (regardless of the availability of the declarant, "[a] spontaneous statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is generally admissible).  Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not

based on an unreasonable determination of the facts. Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Three: Sub-claim E

Petitioner next argues that his trial counsel was ineffective in failing to object or move for a mistrial when during closing argument the prosecutor referred to a statement made by Ms. Holman, that Petitioner was going to kill her, as "uncontroverted" (ECF No. 1 at 22–23).

1. Clearly Established Supreme Court Law

The law governing ineffective assistance of counsel claims is set forth *supra*.

2. Federal Review of State Court Decision

Petitioner exhausted this claim in state court. The post-conviction court denied relief, and the First DCA per curiam affirmed the denial. The state circuit court adjudicated the claim as follows:

> Finally, Defendant argues that Mr. McCleary failed to object when the prosecutor said during closing that a statement made by the victim that Defendant was going to kill her was "uncontroverted." Even if the term was an improper comment on Defendant's right to remain silent, the error was not so prejudicial that the outcome of the proceeding would have been different had the comment not been made. Since again, Defendant cannot show prejudice, his claim must be denied.

(Ex. OO at 565–66). The post-conviction court correctly identified *Strickland* as the federal law governing this claim (*see id*. at 561–62). Therefore, Petitioner is entitled

to relief only if the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence.    Respondent argues that the state court determination was correct and that the record supports the determination.

During his closing argument at trial, defense closing argued that "[a]ll the evidence that the State has presented is basically circumstantial or has been alluded or deluded in some form or fashion" (Ex. U at 364).  In rebuttal, the prosecutor responded as follows:

> Mr. McCleary has indicated in this case it's a circumstantial one that has been deluded by the evidence in this situation.  Well, there's one thing that's not deluded, folks, and that's the phone call.  Because that is the voice of the defendant in this situation.
>
> Now, he attacks some of the—or we go after some of the witnesses.  We talk about Julie Faulkner and some of the questions about that.  But there's one thing that has not been—not been broken, and that's the simple fact that she observed that defendant beating on Mary Knox Holman that night.  She observed and heard the victim say, you're going to kill me just like you said you will.  Uncontroverted in that situation.
>
> It talks about the physical abuse and how she was just trying to get out of the car and he was helping her.  Well, remember what Ms. Faulkner said.  She was getting out of the car because she was being beat.

(Ex. U at 377).

At the evidentiary hearing on Petitioner's Rule 3.850 motion, trial counsel was questioned about his failure to object when the prosecutor stated that Ms. Holman's

statement was uncontroverted. Mr. McCleary responded that if that comment was reversible error, the appellate court would have dealt with it (Ex. NN at 444–45).

Under Florida law, "[a] comment suggesting a witness gave 'uncontradicted' or 'uncontroverted' evidence is an impermissible comment on appellant's right to remain silent in those cases where the defendant is the only individual who can contradict the evidence." *Bell v. State*, 33 So. 3d 724, 726 (Fla. 1st DCA 2010) (citations omitted), *approved* 108 So. 3d 639 (Fla. 2013). However, "it cannot be said that comment on silence always denies the accused a fair trial and is thus subject to per se reversal." *State v. DiGuilio*, 491 So. 2d 1129, 1137 (Fla. 1986). Improper prosecutorial comment is subject to a harmless error analysis, and will give rise to reversal of a conviction only if the comment is so prejudicial that it vitiates the entire trial. *King v. State*, 623 So. 2d 486 (Fla. 1993); *Watts v. State*, 593 So. 2d 198 (Fla. 1992). "Where there is an allegation of improper comments by a prosecutor, we do not consider the comments themselves in a vacuum; rather, we view the allegedly-wrongful comments in context." *McKenney v. State*, 967 So. 2d 951, 955 (Fla. 3d DCA 2007).

This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution. *See Williams v. McDonough*, No. 4:04cv496/RH/WCS, 2006 WL 1687836 (June 15, 2006). A prosecutor's improper statements to the jury do not alone justify habeas relief but must

be evaluated in light of the entire trial record. *United States v. Young*, 470 U.S. 1, 11–12 (1985). "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The comments therefore must have impacted the jury's ability to fairly judge the evidence at trial. *Young*, 470 U.S. at 12. Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied: (1) the prosecutor's comments must have been improper, and (2) the comments must have rendered the trial fundamentally unfair. *See United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir.1991) (citations omitted); *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987). If a reviewing court is confident that, absent the improper remarks, there is no reasonable probability that the outcome of the trial would have been different, the trial cannot be said to have been fundamentally unfair. *See Brooks*, 762 F.2d at 1402; *Tucker v. Kemp*, 802 F.2d 1293, 1296 (11th Cir. 1986).

In applying this standard, a reviewing court should not assess prosecutorial comments in isolation, "shorn of their context"; rather, the court must examine the entire context of the trial proceeding. *Cargill v. Turpin*, 120 F.3d 1366, 1379 (11th Cir. 1997) (citing *Brooks*, 762 F.2d at 1413). "In this regard, isolated or ambiguous

or unintentional remarks must be viewed with lenity." *Id*. (internal quotation and citation omitted). Furthermore, the court should evaluate whether "defense counsel's closing argument . . . ameliorate[d] the damage done to the defense by the prosecutor's [statements]." *Id*. (citations omitted). Moreover, the court must consider the trial court's instructions to the jury, as they "may remedy effects of improper comments." *Id*. (internal quotation and citation omitted). Finally, the court must consider the evidence of guilt, as "[a] court need not determine whether specific arguments are proper or improper if, taken as a whole, they would not require relief." *Id*. (internal quotation and citation omitted). Clearly, where the evidence against the accused is very strong, in order to merit relief, prosecutorial misconduct would have to be even more egregious and pervasive than in cases where the evidence is less compelling, for example, where the defendant has a viable defense.

In Petitioner's case, Ms. Faulkner's testimony repeating Ms. Holman's statement was part of larger evidence the prosecution presented to prove Petitioner's guilt. In addition to other evidence the State presented, discussed *supra*, the State presented several witnesses who testified that Petitioner had told them that he should kill Ms. Holman and bury her in the back yard. Rose Steele, an acquaintance of Petitioner's, testified that "[Petitioner] was upset about Linda [Coski] getting out of jail and that he said that Mary wouldn't leave him alone, and that he guessed he was just going to have

to kill the bitch and bury her in the backyard with the cat" (Ex. T at 143). Debra
Douglas, a friend of the victim and an acquaintance of Petitioner's was asked if she
ever heard him make remarks about doing Ms. Holman harm. She testified that "a few
times" Petitioner said that "he had to kill her," and on more than one occasion "[h]e
said he had to kill the crazy bitch because she was driving him nuts" (*Id.* at 147). Both
of these witnesses also testified that at the time they did not take these statements too
seriously. Sheila Green, Petitioner's former sister-in-law, testified that "[Petitioner]
was frustrated and he said, I guess I'm going to have to kill the bitch and bury her in
the backyard" (*Id.* at 198). When asked why Petitioner was upset with Ms. Holman,
Ms. Green testified that Petitioner and Ms. Holman fought a lot, "[b]ut his girlfriend
that he lived with was about to get out of prison and he didn't know what to do with
both of them, I guess" (*Id.* at 199). Detective Orr testified in the first trial (and this
testimony was read to the jury in the third trial), that Petitioner told him during the
stand-off when they were attempting to arrest him that "Mary's not, she's never
coming back" (Ex. U at 211). Detective Orr elaborated as follows:

> And you know at times he would kind of sob and tell me that he did not
> want anyone else to get hurt, and I would ask him well, who's gotten
> hurt? I said nobody's gotten hurt yet, Richard. And he goes, you don't
> understand. I can't tell you. I'm not—you know, I can't talk to you
> about it.

(*Id.*). In addition, Petitioner made similar statements in the telephone call with his

girlfriend, Ms. Coski, which was recorded and played for the jury.  Finally, Ms. May testified that Petitioner confessed to the crime.

In context, the prosecutor's reference to Ms. Faulkner's testimony in his rebuttal final argument was in response to the defense closing argument premise that all of the State's evidence was circumstantial or had been deluded in some form.  The state court found that even if this comment was impermissible, the error was not so prejudicial that the outcome of the trial would have been different had the comment not been made.  Therefore, the state court must have determined that sufficient evidence existed to support the conviction, absent the impermissible comment on Petitioner's failure to testify. The record supports this determination. Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.  Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Three: Sub-claim F

Petitioner next claims that his trial counsel was ineffective for failing to object to the prosecutor's cross-examination of crime scene investigator Janice Johnson when he asked her if Petitioner could have cleaned any physical evidence from his car given that he had time to dispose of Ms. Holman's body (ECF No. 1 at 23).

1.    Clearly Established Supreme Court Law

The law governing ineffective assistance of counsel claims is set forth *supra*.

2.    Federal Review of State Court Decision

Petitioner exhausted this claim in state court.  The post-conviction court denied

relief, and the First DCA per curiam affirmed the denial.  The state circuit court denied

the claim, referencing another claim in which it found that a prosecutorial comment

during closing was a fair comment based on the evidence presented at trial, stating:

> Similarly, it was not error for the State to question crime scene
> investigator Janice Johnson about whether Defendant could have wiped
> down the vehicle.

(Ex. OO at 565) (footnote omitted).  The post-conviction court correctly identified

*Strickland* as the federal law governing this claim (*see id*. at 561–62).  Therefore,

Petitioner is entitled to relief only if the state court's adjudication of this claim was

contrary to or an unreasonable application of *Strickland* or was based on an

unreasonable determination of the facts in light of the evidence.  Respondent argues

that the state court determination was correct and that the record supports the

determination.

At trial, the defense called Janice Johnson as a witness, and she described the

various pieces of evidence collected at the victim's home and Petitioner's home and

in his car.  She was also asked if she saw any blood in his car.  Ms. Johnson answered,

"I personally did not see any blood" (Ex. U at 293). On cross-examination, the

prosecutor asked Ms. Johnson the following questions related to this testimony:

> Q. [Mr. Molchan]: Okay. Now, as far as—you didn't find any blood in
> your observations? And that's one of the things when you're swabbing,
> you're looking to see if there's any bloody material in the vehicle?
> A. [Ms. Johnson]: That's correct.
> Q. You didn't see any, correct?
> A. No.
> Q. And so if somebody took the time to dispose of the body, it would
> probably indicate they would wipe down the car, too, wouldn't they, from
> the results? They would have time to do both if they dispose of the body?
> A. There are chemicals if the car was cleaned we could possibly could
> bring up the blood.
> Q. But they would have the opportunity, would they not?
> A. Yes.

(*Id*. at 297). Petitioner argues that the prosecutor's questioning "called for speculation

on the part of the witness, interjected the prosecutor's opinion, and [] commented on

facts not received into evidence by referring to the test results that were never supplied

to the defense" (ECF No. 1 at 23).

The circuit court found that it was not error for the prosecutor to ask this

question based on the evidence presented at trial. Therefore, given the state court's

finding, it was not ineffective assistance for defense counsel to fail to object. *See*

*Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying

federal habeas relief on ineffective assistance claim based on counsel's failure to make

state law-based objection; holding that the Florida Supreme Court's conclusion that the

proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . .  It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).  Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.  Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Four:

> "The Trial Court Erred in Denying Ground Eight of Petitioner's Postconviction Motion After An Evidentiary Hearing Where Petitioner Claimed That Due to Cumulative Errors He Was Denied A Fair Trial"

In this ground, Petitioner alleges that the cumulative effect of the ineffective assistance of counsel claims presented in his counseled amended 3.850 motion entitle him to habeas relief (ECF No. 1 at 24–26, 30).

Petitioner exhausted this claim in state court.  The post-conviction court denied relief, and the First DCA per curiam affirmed the denial. The state circuit court

adjudicated the claim as follows:

> In his final ground, Defendant claims that he is entitled to relief based on cumulative error. The Court finds that, when considered collectively, Defendant's claims do not entitle him to relief.

(Ex. OO at 566). Respondent contends that the Supreme Court has not held that distinct constitutional claims may be cumulated to grant habeas relief, and that the circuit court of appeals' decisions are mixed on this issue (ECF No. 19 at 96–97 & n.20). In the alternative, Respondent argues that if this claim is cognizable in federal habeas, it appears that Petitioner exhausted the claim in the state court and that the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law.

1.    Clearly Established Supreme Court Law

In rejecting a similar "cumulative error" argument made by a § 2254 habeas petitioner, the Eleventh Circuit stated: "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim." *Forrest v. Fla. Dep't of Corr.*, 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) (unpublished but recognized for persuasive authority). The *Forrest* panel further noted "[h]owever, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel

undermined the reliability of the finding of guilt.'" *Id*. at 564–65 (quoting *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984)).  In light of *Cronic* and the absence of Supreme Court precedent applying the cumulative error doctrine to claims of ineffective assistance of counsel, the state court's rejection of Petitioner's claim is not contrary to or an unreasonable application of clearly established federal law.  *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007) (the Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this"); *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established

law).

Furthermore, the Eleventh Circuit has rejected similar "cumulative error" claims asserted in federal habeas actions. *See*, *e.g.*, *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273 (11th Cir. 2014). The court in *Insignares* explained:

> Insignares claims cumulative error deprived him of a fair trial. Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial. *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). "This court has made clear that where '[t]here [is] no error in any of the [trial] court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant's] convictions is without merit.'" *Id.* (quoting *United States v. Taylor*, 417 F.3d 1176, 1182 (11th Cir. 2005) (per curiam)) (alterations in original). Because we have found no error in the issues on appeal, Insignares has failed to show that the state judge lacked a reasonable basis to deny his cumulative-error claim.

*Id.* at 1284; *Morris*, 677 F.3d at 1132 ("Plainly, Morris's cumulative error claim must fail. As demonstrated above, none of Morris's individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate.").

2.     Federal Review of State Court Decision

Even assuming, without deciding, that Petitioner's "cumulative effect" claim is cognizable on federal habeas review, the claim provides no basis for federal habeas relief. Petitioner raised his "cumulative effect" claim in Ground Eight of his Rule 3.850 motion (Ex. MM at 323). The First DCA summarily affirmed the denial of this

claim.  Because neither the First DCA nor this court has found any error at all in the issues raised by Petitioner, applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to or an unreasonable application of federal law.  Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Five:

> "Appellate Counsel Was Ineffective For Failing To Federalize Petitioner's Issue One That The State Had Failed To Present Sufficient Corroborating Evidence To Establish The Trustworthiness Of Petitioner's Alleged Confession To State's Witness Marilyn May"

In his final ground for relief, Petitioner argues that his appellate counsel was ineffective "for failing to federalize Petitioner's Issue One [of his initial brief on direct appeal] that the State had failed to present sufficient corroborating evidence to establish the trustworthiness of Petitioner's alleged confession to state's witness Marilyn May" (ECF No. 1 at 26–27, 30–31).

1.      Clearly Established Supreme Court Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is that enunciated in *Strickland*.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  The Supreme Court has held that counsel need not raise every nonfrivolous claim on appeal.  *See Jones v. Barnes*, 463 U.S. 745 (1983).  The Court in *Jones*

emphasized the importance of winnowing out weaker arguments in favor of stronger ones.  The Court stated:

> 'Most cases present only one, two, or three significant questions . . . .  Usually, . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention.  The effect of adding weaker arguments will be to dilute the force of the stronger ones.' (Citing R. Stern, Appellate Practice in the United States 266 (1981)).

*Id.*, 463 U.S. at 752.  The Court has also stated that while it is possible to bring a *Strickland* claim based on appellate counsel's failure to raise a particular claim in a merits brief, it will be difficult to demonstrate incompetence.  *See Robbins*, 528 U.S. at 288.  "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Id.* (citation omitted).  To demonstrate prejudice, a defendant must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, he would have prevailed on appeal.  *See id.*, 528 U.S. at 285.  If an omitted claim would have had a reasonable probability of success on appeal, then counsel's performance necessarily resulted in prejudice.  *Heath v. Jones*, 941 F.2d 1126, 1132 (11th Cir. 1991).

    2.    Federal Review of State Court Decision

    Petitioner presented this claim to the First DCA in his petition for a writ of

habeas corpus (*see* Ex. UU at 4–7).  The First DCA per curiam denied the petition without explanation, simply stating, "[t]he petition alleging ineffective assistance of appellate counsel is denied on the merits" (Ex. VV).

On direct appeal, this issue was captioned as follows: "The Trial Court Erred in Concluding that the State Offered Sufficient Evidence in Establishing Corpus Delicti" (Ex. X at 26).  Petitioner's counsel argued the issue under state law grounds only (*see* Ex. X at 28–30, 33–35).  *See Bassett v. State*, 449 So. 2d 803, 807 (Fla. 1984) (holding that common law corpus delicti requires proof independent of a confession that the crime charged was in fact committed); *Burks v. State*, 613 So. 2d 441 (Fla. 1993).

Respondent argues that because the issue of corpus delicti was presented in the trial court as an issue of state law only, appellate counsel cannot be deficient for failing to raise an unpreserved federal constitutional issue for the first time on appeal (ECF No. 19 at 102) (*see* Ex. A at 108–11; Ex. F at 4–8; Ex. G at 180–83; Ex. R at 170–71 & Ex. T at 107–08).  *See Williamson v. Dugger*, 651 So. 2d 84, 86–87 (Fla. 1994) ("we have repeatedly held that appellate counsel cannot be considered ineffective for failing to raise issues which he was procedurally barred from raising because they were not properly raised at trial").

Furthermore, Respondent argues that Petitioner cannot demonstrate prejudice because the burden under Florida's corpus delicti rule is higher than the burden under

federal law. Since Petitioner was unable to prevail under Florida law, there is no reasonable likelihood that he would have prevailed in federal court; thus, the result would not have been different.

Florida law generally requires that the corpus delicti be established independent of a confession before a confession will be admitted into evidence. *See Franqui v. State*, 699 So. 2d 1312 (Fla. 1997); *Bassett v. State*, *supra*; *McArthur v. State*, 793 So. 2d 1190 (Fla. 5th DCA 2001). The corpus delicti rule has been described by the Florida Supreme Court as follows:

> It is a fundamental principle of law that no person be adjudged guilty of a crime until the state has shown that a crime has been committed. The state therefore must show that a harm has been suffered of the type contemplated by the charges (for example, a death in the case of a murder charge or a loss of property in the case of a theft charge), and that such harm was incurred due to the criminal agency of another. This usually requires the identity of the victim of the crime. A person's confession to a crime is not sufficient evidence of a criminal act where no independent direct or circumstantial evidence exists to substantiate the occurrence of a crime. The judicial quest for truth requires that no person be convicted out of derangement, mistake or official fabrication.

*State v. Allen*, 335 So. 2d 823, 825 (Fla. 1976) (footnote omitted). In order to satisfy the first requirement, each element of the relevant offense must be shown to exist. *Franqui*; *Burks v. State*, *supra*; *Price v. State*, 776 So. 2d 1100 (Fla. 5th DCA 2001). With respect to the second requirement, the proof does not have to show the specific identity of the person who committed the crime. *Id*.

Case No.: 3:17cv483/LAC/EMT

Corpus delicti may be established with direct or circumstantial evidence. *Price*, 776 So. 2d at 1101. "The state has the burden to bring forth 'substantial evidence' tending to show the commission of the charged crime . . . . This standard does not require the proof to be uncontradicted or overwhelming, but it must at least show the existence of each element of the crime." *Id*. Traditional application of the corpus delicti rule requires the State to "'at least show the existence of each element of the crime' to authorize the introduction of a defendant's admission or confession." *State v. Colorado*, 890 So. 2d 468, 470 (Fla. 2d DCA 2004) (quoting *Allen*, 335 So. 2d at 825). Without independently established corpus delicti, a defendant's admissions or confessions cannot be admitted into evidence. *Chaparro v. State*, 873 So. 2d 631, 633 (Fla. 2d DCA 2004).

Federal courts, on the other hand, adhere to the "trustworthiness doctrine" in determining whether a defendant's admission or confession may be used to support a conviction. *See Opper v. United States*, 348 U.S. 84 (1954); *Smith v. United States*, 348 U.S. 147, 152 (1954). Under that doctrine, a defendant's admission or confession may be used to support a conviction if sufficient independent evidence corroborates the admission or confession so as to establish its trustworthiness. *Opper*, 348 U.S. at 93. In discussing the quantum of corroborative evidence required, the Court stated:

We think the better rule to be that the corroborative evidence need not be

> sufficient, independent of the statements, to establish the corpus delicti. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense. It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth. Those facts plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt.

*Id*. (citation omitted). *See Geiger v. State,* 907 So. 2d 668, 673 (Fla. 2d DCA 2005) (noting that the Supreme Court rejected the traditional corpus delicti rule for the trustworthiness doctrine); *State v. Dionne*, 814 So. 2d 1087, 1091 (Fla. 4th DCA 2002) ("The difference between the two doctrines is that the corroboration aspect of corpus delicti is more concerned with the elements of the offense whereas the trustworthiness doctrine is concerned with the trustworthiness of the statements contained within the confession.").

In his initial brief on appeal, Petitioner argued that in his case the State had failed in its burden of establishing corpus delicti because "there is no blood, no indication of violent struggle, and no intricate chain of circumstantial evidence. Furthermore, the alleged victim's past unconventional behavior doesn't immediately and obviously preclude the possibility of voluntary absence, accidental death, or suicide" (Ex. X at 31 (parenthetical omitted)). During Petitioner's trial, the State

presented evidence that Ms. Holman had not been seen or heard from by friends or acquaintances since the night she disappeared; that she was the beneficiary of a $300,000 trust and had not contacted her cousin and trustee of the trust since the night she disappeared; that on the night before her disappearance she had a verbal and physical altercation with Petitioner; that her sandals were found concealed in Petitioner's car; that her I.D. was found on the shoulder of a local road; and that Petitioner had refused to surrender to police. The trial court found that the State had established corpus delicti in each of Petitioner's three trials based on the same evidence (*see* Ex. G at 180–83; Ex. R at 170–71; Ex. T at 107–08). At the first trial, the court elaborated on its finding as follows:

> And I think that when you take the fact that she had a trust fund that she got a check from every single month, and then—and that she was a poor financial manager, and then couple that with the fact that she no longer draws the check, she no longer has had any communication with her trustee, with the fact that [Petitioner] was seen with her just before she disappeared, coupled with the fact that—and I understand you may or may not [accept that] argument, Mr. Stopp, but coupled with the fact that the witness did say that those were her sandals and that they were hidden in the trunk, with the fact that a couple days later, the ID was found on the side of the road in an area away from where they were last together, coupled with Investigator Orr's statement that [Petitioner] refused to come out of the house, taking each one individually, it may very well be a situation, you know, with some other explanation, but when you couple them and the statement—and the standard being tends to show, I think it meets it.

(Ex. G at 182–83).

Case No.: 3:17cv483/LAC/EMT

Petitioner has not demonstrated that appellate counsel was ineffective for raising this issue under state law rather than under federal law.  Even if the federal issue had been properly preserved in the trial court, given that the standards are different, appellate counsel could have decided to raise the issue under the law which he determined was more likely to result in a reversal based on the facts of Petitioner's case.  Petitioner has not demonstrated that there is a reasonable likelihood that he would have prevailed on appeal had appellate counsel "federalized" this claim. Petitioner has not demonstrated that the state court's adjudication of this claim is contrary to or an unreasonable application of *Strickland*.  Therefore, Petitioner is not entitled to habeas relief on this ground.

IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has

made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327). Here, Petitioner cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

It is hereby **ORDERED** that:

The clerk of court is directed to substitute Mark S. Inch for Julie Jones as Respondent.

Accordingly, it is respectfully **RECOMMENDED** that:

1.    The petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

Case No.: 3:17cv483/LAC/EMT

2.      Petitioner's Motion to Expand the Record with Newly Discovered Evidence (ECF No. 24) be **DENIED** for the reasons stated in the discussion of Ground Two, Sub-claim A, *supra*.

3.      A certificate of appealability be **DENIED**.

At Pensacola, Florida, this 25<u>th</u> day of February 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**

# Attachment A

(Order of the State Circuit Court, dated December 5, 2018, denying Petitioner's Motion for Post-Conviction Relief Under Fla. R. Crim. P. 3.850, filed March 15, 2018)

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
IN AND FOR ESCAMBIA COUNTY, FLORIDA

STATE OF FLORIDA,

vs.

Case No.:   2004-CF-3230 A
Division:   C

RICHARD LEE HUNTER,

     Defendant.

---

## ORDER DENYING MOTION FOR POST-CONVICTION RELIEF

---

    **THIS CAUSE** came before the Court upon the Defendant's motion for post-conviction relief filed on March 15, 2018, pursuant to rule 3.850, Florida Rules of Criminal Procedure. The Defendant raises a claim of "newly discovered evidence." The Court finds the motion should be summarily denied.

<u>Background</u>

    The Defendant was indicted for the murder of Mary Holman. The Defendant was found guilty and sentenced to life in prison. <u>Attachment 2</u>. The applicable trial was actually the third one commenced in this case. The First District Court of Appeal reversed the conviction that followed the Defendant's first trial. <u>Hunter v. State</u>, 973 So. 2d 1174 (Fla. 1st DCA 2007). The second trial ended in a mistrial. <u>Attachment 1</u>. The third trial resulted in the Defendant's present conviction for first degree murder.

    The Defendant's judgment and sentence were affirmed on direct appeal. <u>Attachment 3</u>. The Defendant's conviction became final in 2011. <u>Id</u>.

1

<u>Claims of Newly Discovered Evidence</u>

As the Florida Supreme Court has explained, "to obtain a new trial based on newly discovered evidence: (1) 'the evidence must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence'; and (2) the evidence 'must be of such nature that it would probably produce an acquittal on retrial.'" <u>Wyatt v. State</u>, 78 So. 3d 512, 527 (Fla. 2011), <u>citing</u> <u>Jones v. State</u>, 709 So. 2d 512 (Fla. 1998). "The term 'fact' under rule 3.850(b)(1) refers to newly discovered evidence that tends to prove or disprove guilt or innocence." <u>Lamb v. State</u>, 212 So. 3d 1108, 1110 (Fla. 5th DCA 2017)(citations omitted).

<u>Analysis</u>

The evidence the Defendant claims is "newly discovered" are pawn shop records.[1] These records do not constitute "newly discovered evidence." Fla. R. Crim. P. 3.850(b)(1).

The Defendant cannot show that these pawn shop records could not have been previously discovered by the use of diligence. The Defendant's trial was conducted in December 2009. The Defendant has not demonstrated how pawn shop records from 2004 could not have been discovered prior to trial in 2009.

Indeed, during a prior post-conviction proceeding, the Defendant testified at an evidentiary hearing that, after the mistrial that occurred during the Defendant's second trial, he told his counsel "look, the ring was in the pawn shop." <u>Attachment 7</u>, at 42. This would have been sometime in 2009, after the Defendant's second trial resulted in a mistrial in October 2009, but prior to the Defendant's third trial in December 2009. <u>Attachments 1 and 2</u>. The Defendant

---

[1] It would seem the custodian of the records has not released the records to the Defendant. Therefore, it appears the Defendant is simply speculating as to the actual content of these records. "Postconviction relief cannot be based on speculative assertions." <u>Jones v. State</u>, 845 So. 2d 55, 64 (Fla. 2003).

testified that he asked his counsel "about getting the records to show that I didn't have no ring." Attachment 7, at 43. In a prior sworn post-conviction motion, the Defendant alleged under oath that the "Public Defender's Office has a staff of investigators, [and] it would have been very simple to locate records of the pawned ring or possibly the ring itself." Attachment 6, at 13-14, 23. The Court denied post-conviction relief, finding defense counsel's testimony credible that the issue was never brought to his attention, and because the Defendant failed to introduce evidence that the ring was in a pawnshop. Attachment 8.

A claim that these pawn shop records constitute "newly discovered evidence" is directly contrary to his prior allegation under oath that it would have "very simple" for his trial counsel to acquire these records prior to trial. "[T]hese two categories of evidence - evidence that a reasonably competent attorney would have discovered before trial and evidence that counsel could not have discovered before trial with due diligence - are mutually exclusive." United States v. DeRewal, 10 F.3d 100, 104 (3d Cir. 1993). The Defendant has previously conceded that his attorney could have discovered these records with due diligence.

Furthermore, these 2004 pawn shop records could have been obtained and presented during the Defendant's post-conviction proceedings. Thus, in addition to the time bar, the instant motion is an abuse of process because it raises an issue that could have, and was, litigated in the Defendant's prior post-conviction proceeding. Fla. R. Crim. P. 3.850(h).

Moreover, these pawn shop records, even if they show the Defendant's ring was in a pawn shop during the relevant time frame, would not "probably produce an acquittal on retrial." This evidence does not go to the merits of the case. Rather, it could only serve as a potential basis to impeach Marilyn May's testimony. The Court recognizes that "there may be cases where newly discovered evidence may warrant a new trial notwithstanding that the evidence

3

goes only to the impeachment of a witness." <u>McDonald v. Pickens</u>, 544 So. 2d 261, 264 (Fla. 1st DCA 1989).  However, this is not such a case.

Even if Marilyn May's testimony could be successfully impeached on the issue of the ring, that would not alter the essence of May's testimony as to the incriminating statements made by the Defendant.  In addition, May's testimony was not the only evidence of the Defendant's guilt.  The Defendant also stated to Linda Coski that "a certain problem's gone fucking forever." The Defendant explained he could not talk about it "or I probably will end up in prison." <u>Attachment 5</u>.  The Defendant also said to Linda Coski that the victim would "never be here again, never," and told Coski, "Baby, don't, don't ask me nothing else."  Nevertheless, the Defendant subsequently stated, "let's put I this way, you never have to worry about her ever being in our lives again, or anybody else's."  This exchange was also recorded:

Defendant:    Yeah?  I think she killed herself.

Coski:        I don't, I don't, I really don't.

Defendant:    Well, I feel she's dead.

Coski:        People like that don't kill themselves.

Defendant:    Huh?

Coski:        People like that don't kill themselves, unless by accident.

Defendant:    Let's not talk about it anymore, please?

The Defendant also said, "Well, believe me when I tell you this, she'll never been [sic] in any part of our lives again [...] you'll never see her again."  The Defendant stated, "don't make me say anything else, these calls are recorded and all...I'm a little worried, you know, I don't want to go to prison."  Later in the call, the Defendant said, "Linda, I wish I could talk to you." Coski replied, "I think I know what you're already getting at," and shortly after said, "I mean

that was stupid, what can I say?"  Coski also said, "I don't want to know about it."  <u>Attachment</u>
<u>5</u>.

     This recorded telephone conversation between the Defendant and Linda Coski
corroborates his confession to Marilyn May, and is compelling evidence of the Defendant's guilt.
The victim's disappearance itself also corroborates his confession to Marilyn May.  <u>Attachment</u>
<u>4</u>, at 352-363 (Prosecutor's initial closing argument).  Debra Douglas's testimony confirms that
the Defendant asked to speak to May.  <u>Attachment 4</u>, at 152.  Also, Douglas testified that the
Defendant stated he dug out his car (which he claimed was stuck in the mud) with a hammer.
This statement is oddly similar to May's testimony that the Defendant stated he dug the victim's
grave with a hammer; both accounts entail the Defendant's digging in the earth with his hammer,
which is not common.  <u>Attachment 4</u>, at 149, 164.  There is no apparent motive for May to lie as
to what the Defendant told her.  <u>Attachment 4</u>, at 184.  The Defendant made incriminating
statements to Wayne Orr during the Defendant's 12-hour standoff with law enforcement.
<u>Attachment 4</u>, at 211-212.  The victim's sandals were found by law enforcement in the wheel-
well in the trunk of the Defendant's car.  <u>Attachment 4</u>, at 101, 110-114.

     Finally, May testified the Defendant confessed on July 12, 2004.  Julie Faulkner
witnessed the victim say to the Defendant on July 10, 2004, shortly before the victim
disappeared, "you're going to kill me like you said you were."  <u>Id.</u>, at 99-100, 116-118.

     Based on the foregoing, even if the pawnshop records show that the Defendant's ring was
in a pawn shop, and were admitted to impeach May's testimony regarding the Defendant's ring
being "full of blood," the records would not "probably produce an acquittal on re-trial."

Conclusion

Accordingly, it is **ORDERED and ADJUDGED** that the Defendant's motion for post-conviction relief is hereby **DENIED.** The Defendant has the right to appeal within thirty (30) days of the rendition of this order.

**DONE and ORDERED** in Chambers in Pensacola, Escambia County, Florida on this 5th day of December, 2018.

JENNIE M. KINSEY
Circuit Judge

JMK/lcw

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and accurate copy of the foregoing order was furnished via regular U.S. Mail (*unless otherwise indicated*) to:

Richard Hunter, DC # 210660
Blackwater River Correctional Facility
5914 Jeff Ates Road
Milton, FL 32583

Kenneth Ridlehoover
Assistant State Attorney
(*via electronic service*)

this 10 day of December, 2018.

**PAM CHILDERS, Clerk of Court**

BY: 
Deputy Clerk